# LAKE SUPERIOR SHIP CANAL, RAILWAY AND IRON COMPANY v. CUNNINGHAM.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MICHIGAN.

No. 49. Argued November 2, 5, 1894. — Decided December 10, 1894.

The grant of public lands to Michigan in the act of June 3, 1856, c. 44, 11 Stat. 21, to aid in the construction of "railroads from Little Bay de Noquet to Marquette, and thence to Ontonagon, and from the two last named places to the Wisconsin state line," was a grant *in præsenti*, which upon the filing of the map of definite location, November 30, 1857,

operated to withdraw the lands from public domain open to settlement by individuals; and the provision in the act for forfeiture of the grant if the road should not be completed within ten years was a condition subsequent, which could only be enforced by the United States.

That act contemplated separate railroads from Ontonagon to the state line and from Marquette to the state line, and was so regarded and treated by the State of Michigan.

Prior to the act of March 2, 1889, c. 414, 25 Stat. 1008, no legislative or judicial proceeding was taken by the United States, looking to a forfeiture of the Ontonagon grant; no act or resolution was passed by the legislature of Michigan retransferring it to the United States; and the conveyance executed by the Governor of Michigan, August 14, 1870, assuming to formally release it to the United States, was beyond the scope of his powers and void.

As general terms in a subsequent Congressional grant are always held not to include lands embraced within the terms of a prior grant, and as by the filing of the map of definite location of the railroad, and the certification of the lands to the State, the lands granted by the act of June 3, 1856, had become identified and separated from the public domain before the passage of the act of March 3, 1865, c. 202, 13 Stat. 519, granting lands to Michigan to aid in the construction of a ship canal, the State acquired no title to such lands through the latter act, and whether they were or were not returned to the United States was not a question of fact, but one of law, depending upon the construction to be given to the resolution of the legislature of Michigan of February 21, 1867.

At the time of the passage of the act of March 2, 1889, c. 414, 25 Stat. 1008, forfeiting to the United States the title to the lands granted to Michigan by the act of June 3, 1856, neither the plaintiff nor the defendant had any title to the tract in controversy in this action, but, like other lands within the Ontonagon grant, it belonged to the State of Michigan, subject to forfeiture by the United States ; and, construing that act, it is *Held,*

(1) That § 1 grants nothing to and withdraws nothing from the parties;

(2) That the provision in § 2 as to the rights of the Portage Lake Canal Company and the Ontonagon and Brule River Railroad Company means simply that neither forfeiture nor confirmation nor any other provision in the act shall be construed as a final settlement of all the claims of those companies or their grantees;

(3) That the provision in § 2 as to prejudicing any right of forfeiture or recovery of the United States should not be construed as denying the confirmation granted by § 3;

(4) That the provision in § 2 touching the rights of persons claiming adversely to those companies or their assigns under the laws of the United States means that the confirmation to them shall not be taken as an attempt to invalidate any legal or equitable rights as against such companies;

(5) That the term " public land laws " in § 3 refers to any laws of Congress, special or general, by which public land was disposed of;

(6) That the phrase "where the consideration received therefor is still retained by the government" is satisfied whenever the conditions of the attempted conveyance have been fully complied with, and apply to a homestead claim as well as to a preëmption claim;

(7) That the proviso as to "original cash purchasers" is not to be taken as implying that the confirmation only extends to cash purchasers, but as also making further limitations as to some of those in whose behalf the confirmation was proposed;

(8) That it was the evident 'intent of Congress that in all cases of conflict between a selection in aid of the canal grant and the claims of a settler, the confirmation should depend upon the state of things on the 1st of May, 1888;

(9) That the words "homestead claim," as used in this act, include cases in which the claimant was, on the 1st of May, 1888, in the actual occupation of the land with a view of making a homestead of it, whether he had or had not made a formal application at the local land office;

(10) That the defendant in error Cunningham in No. 49, who was on the 1st of May, 1888, in the occupation of the tract claimed by him, was, within the terms of the confirmatory act, a *bona fide* claimant of a homestead; but the defendant in error Finan in No. 50, not being in such occupation at that date, was not entitled to the benefit of the act.

THIS was an action commenced by the plaintiff in error, plaintiff below, in the Circuit Court of the United States for the Western District of Michigan, on July 17, 1888, to recover the possession of the southwest quarter of section 25, township 44 north, range 36 west. Upon the first trial a verdict was returned in favor of the plaintiff. In conformity with the opinion of Mr. Justice Jackson, then Circuit Judge, 44 Fed. Rep. 819, a new trial was granted, which, on July 26, 1890, resulted in a verdict under instructions of the court in favor of the defendant, upon which verdict judgment was rendered.

To reverse that judgment this writ of error was brought. The plaintiff claimed title by virtue of certain land grants made by Congress, to the State of Michigan, to aid in the construction of a canal, and a confirmation by an act of Congress of March 2, 1889. The defendant insisted that no title passed by the canal grants because the land had theretofore been granted by Congress to aid in the construction of a railroad; that he entered upon the land with a view of preëmption, and that his right of preëmption was confirmed by the same

act of Congress of March 2, 1889. The facts in respect to the respective railroad and canal grants are as follows:

On June 3, 1856, Congress passed an act, c. 43, 11 Stat. 20, granting to the State of Wisconsin to aid in the construction of a railroad "from Fond du Lac on Lake Winnebago northerly to the state line" every alternate section of land designated by odd numbers for six sections in width on each side of the road; and on the same date it passed another act, c. 44, 11 Stat. 21, making a similar grant to the State of Michigan to aid in the construction of several railroads, among them being "railroads from Little Bay de Noquet to Marquette, and thence to Ontonagon, and from the two last named places to the Wisconsin state line." This grant was in the ordinary form of a grant *in præsenti,* the language being: "That there be and hereby is granted to the State of Michigan, to aid," etc. The act also provided in section 1, "that the lands hereby granted shall be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever;" in section 3, "that the said lands hereby granted to the said State, shall be subject to the disposal of the legislature thereof, for the purposes aforesaid and no other;" and in section 4, that "if any of said roads is not completed within ten years no further sales shall be made, and the lands unsold shall revert to the United States." Apparently, Congress contemplated among other things the construction of a railroad northerly from Fond du Lac to the line between Wisconsin and the northern peninsula of Michigan, and thence in two branches to Marquette and Ontonagon, on the Lake Superior shore. On February 14, 1857, an act passed the Michigan legislature (Laws of 1857, 346, No. 126) accepting this grant, and transferring to the Marquette and State Line Railroad Company (hereinafter called the Marquette Company) and the Ontonagon and State Line Railroad Company, (hereinafter called the Ontonagon Company,) two corporations created under the laws of the State of Michigan, so much respectively of said grant as was intended to aid in the construction of the road

between Marquette and the state line and that between Ontonagon and the state line. The language of the act making the transfer is emphatic as to the division between the two companies. It reads:

"In like manner all the lands, franchises, rights, powers, and privileges which are or may be granted and conferred, in pursuance of said act of Congress, to aid in the construction of a railroad from Marquette to the Wisconsin state line, be, and the same are hereby vested fully and completely in the Marquette and State Line Railroad Company; in like manner all the lands, franchises, rights, powers, and privileges, which are or may be granted and conferred in pursuance of said act of Congress, to aid in the construction of a railroad from Ontonagon to the Wisconsin state line, are hereby vested fully and completely in the Ontonagon and State Line Railroad Company."

By the same act a board of control was created to supervise the disposition of the granted lands, and in section 11 it was provided that on the failure by the respective companies to construct their lines of road, or any part thereof, in the time and manner required, the "said board of control shall have the power, and it is hereby made their duty, to declare said lands, so far as they have not been sold in good faith, forfeited to the State, and said board of control are hereby required to confer said lands upon some other competent party, under the general regulations and restrictions of this act."

The grant to the State of Wisconsin was conferred by its legislature upon the Chicago, St. Paul and Fond du Lac Railroad Company, an Illinois and Wisconsin corporation, and on March 27, 1857, that corporation was consolidated with the Marquette Company and the Ontonagon Company, the consolidated company taking the name of the Chicago, St. Paul and Fond du Lac Railroad Company. No question is made as to the validity of this consolidation. Neither the Ontonagon nor the Marquette Company filed any map of location, but the consolidated company (hereinafter called the Fond du Lac Company) on November 30, 1857, filed in the General Land Office two maps of definite location, one of the Wiscon-

sin part of its road, and the other of the Michigan portion. On the latter the roads from Marquette and Ontonagon were located so as to unite some five or six miles above the Wisconsin state line, so that the two maps together showed a single continuous line from Fond du Lac through Wisconsin and to a point in Michigan five or six miles above the state line, where it separated into two branches, one going to Marquette and the other to Ontonagon. The Fond du Lac Company built no road — at least none in Michigan. On April 6, 1857, it executed a mortgage covering all its property, including the land grants in Michigan and Wisconsin. Subsequently, foreclosure proceedings were had, and by proper conveyances all the title of the Fond du Lac Company passed to the Chicago and Northwestern Railway Company, the last conveyance being executed on July 1, 1859. On December 12, 1861, the Interior Department certified to the State of Michigan certain lands along the lines of these roads in satisfaction of the grants made by the act of June 3, 1856. These lands were certified in four lists : one, of lands within the six-mile limits of the Ontonagon and State Line branch, (clear). This list included 142,430$\frac{23}{100}$ acres, and among the lands so certified was the tract in controversy in this case.

On March 4, 1861, the legislature of the State of Michigan, contemplating a change of route from Marquette to the Wisconsin state line, passed an act, (Laws of Mich. 1861, 123, No. 90,) the preamble and first section of which are as follows:

"Whereas, the Marquette and State line railroad company have heretofore consolidated with the Chicago, St. Paul and Fond du Lac railroad company, of Wisconsin, and said company having become insolvent, and all its property in Wisconsin transferred to another company : *And whereas*, The most practicable route for a railroad connecting Lake Superior with the system of railroads in Wisconsin, should be located on a different route from the one heretofore partially selected, namely : from Marquette to the mouth of the Menominee River ; therefore, .

"Sec. 1. *The People of the State of Michigan enact*, That for the purpose of placing the aforesaid lands, franchises, rights,

powers and privileges, which are or may be granted in pursuance of said act of Congress, approved June third, eighteen hundred and fifty-six, to aid in the construction of a railroad from Marquette to the Wisconsin state line, near the mouth of the Menominee River, in a position to encourage the early construction of said road, do hereby repeal so much of section two of 'An act to repeal section twenty of an act disposing of certain lands for railroad purposes, approved February fourteenth, eighteen hundred and fifty-seven,' approved February fifteenth, eighteen hundred and fifty-nine, as relates to the extension of the time to complete the first section of twenty miles of the Marquette and state line railroad, or any other act amendatory thereto, and do hereby place the same in charge of the board of control, who shall have power, and [it] is hereby made their duty, to confer said lands, franchises, rights, powers and privileges upon some other competent party or company under the general regulation and restrictions of an act disposing of certain grants of land made to the State of Michigan for railroad purposes by an act of Congress, approved June third, eighteen hundred and fifty-six, and approved February fourteenth, eighteen hundred and fifty-seven, and all acts amendatory thereto."

Nothing was said in this act about the Ontonagon Company or the road from Ontonagon to the state line. In order to carry into effect this contemplated change of route, the Chicago and Northwestern Railway Company promoted the formation of the Peninsula Railroad Company, a corporation organized under the laws of the State of Michigan, and on April 24, 1862, the Peninsula Company applied to the Michigan board of control to transfer to it the land grant theretofore bestowed by the State upon the Marquette Company, which application was endorsed by the Chicago and Northwestern Railway Company, whereupon the board of control made the following order:

"It is now ordered by this board that all the lands, franchises, rights, powers, and privileges which are or may be granted in pursuance of said act of Congress approved June 3, 1856, to aid in the construction of a railroad from Marquette to the Wisconsin state line, be, and the same are hereby, conferred

upon the said Peninsula Railroad Company, under the regulations and restrictions of an act approved February 14, 1857, entitled 'An act disposing of certain grants of land made to the State of Michigan for railroad purposes by act of Congress approved June 3, 1856,' and of all acts amendatory thereto."

And at the same time it passed a resolution, the material portion of which is as follows:

" *Resolved,* That this board of control of railroad land grants for the State of Michigan do hereby recommend and request that Congress do authorize the relocation of the lands granted for the purposes of the line of road from Marquette to the Wisconsin state line so as to conform to the new line that shall be surveyed and adopted by the said Peninsula Railroad Company, terminating at the mouth of the Menominee River, and to the same effect and extent as if such grant had been originally intended to embrace the route so designated and the same had been originally conferred upon said Peninsula Railroad Company."

On July 5, 1862, evidently with a view to carry out the wish of the State of Michigan, as expressed in the act of March 4, 1861, and the resolution of the board of control, Congress passed a joint resolution, No. 38, 12 Stat. 620, whose first section is in these words:

" *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the words 'Wisconsin state line,' in the first section of an act entitled 'An act making a grant of lands to the State of Michigan, in alternate sections, to aid in the construction of railroads in said State,' approved June third, eighteen hundred and fifty-six, shall, without forfeiture to said State or its assigns of any rights or benefits under said act, or exemption from any of the conditions or obligations imposed thereby, be construed to authorize the location of the line of railroad provided for in said act from Marquette, on Lake Superior, to the Wisconsin state line, upon any eligible route, from the township of Marquette aforesaid, to a point on the Wisconsin state line, near the mouth of the Menominee River, and touching at favorable points on Green Bay, with a view of

securing a railroad available for military purposes from Green Bay to the waters of Lake Superior. And the line of railroad as now located in pursuance of said act from Marquette to the Wisconsin state line, according to the records of the General Land Office, is hereby authorized to be changed so as to conform to the route above indicated; which line, when surveyed and the maps and plans thereof filed in the proper office, as required under said act of June third, eighteen hundred and fifty-six, shall confer the same rights upon and benefits to the State of Michigan and its assigns in said new line, as though the same had been originally located under said act."

Sections 4 and 5, so far as they bear upon any question in this case, are as follows:

"SEC. 4. *And be it further resolved*, That the even sections of public lands reserved to the United States by the aforesaid act of June third, eighteen hundred and fifty-six, along the originally located route of the Marquette and Wisconsin State Line Railroad Company, except where such sections shall fall within six miles of the new line of road so as aforesaid proposed to be located, and along which no railroad has been constructed, shall hereafter be subject to sale at one dollar and twenty-five cents per acre.

"SEC. 5. *And be it further resolved*, That upon the filing in the General Land Office of the lists of said railroad lands, in whole or in part, as now selected and certified in the General Land Office, with the certificate of the governor of the State of Michigan, under the seal of the State, that said State and its assigns surrender all claims to the lands, as aforesaid, set forth and described in the lists thereof thus certified, and that the same have never been pledged or sold or in anywise encumbered, then the State of Michigan or its assigns shall be entitled to receive a like quantity of land, selected in like manner, upon the new line of road as thus surrendered upon the first line, and to the extent of six sections per mile in the aggregate for every mile of the new line, according to the general provisions of the act of June third, eighteen hundred and fifty-six."

Prior to this time, and on April 25, 1862, Congress had authorized a relocation of the line in the State of Wisconsin so as to connect with the proposed line from Marquette southward, contemplated by the act of March 4, 1861, of the State of Michigan. 12 Stat. 618, No. 30. On March 18, 1863, in the legislation of the State of Michigan, appears an act, (Laws of Mich. 1863, 186, No. 127,) the first section of which is as follows:

" Sec. 1. *The People of the State of Michigan enact,* That the grant of lands conferred by the board of control upon the Peninsula railroad company, under authority of an act approved March fourth, eighteen hundred and sixty-one, and upon the relocated route authorized for military purposes by resolution of Congress approved July fifth, eighteen hundred and sixty-two, is hereby confirmed unto the said Peninsula railroad company: *Provided,* It shall construct the railroad referred to according to the requirements of the act and resolution of Congress herein referred to."

On May 3, 1863, the Peninsula Company executed a relinquishment to the United States. This relinquishment, after reciting the forfeiture of the grant to the Marquette Company and its bestowal on the Peninsula Company, and the contemplated change of route, reads:

" Now, therefore, the said Peninsula Railroad Company, in consideration of the premises and in consideration that the United States will cause or permit the relocation of said land grant so as to conform to said new line under the provisions of said resolution and the acts aforesaid, do hereby release and surrender to the United States of America all right, claim, and interest in and to so much of the lands heretofore located on the original proposed line of the Marquette and State Line Railroad, from Marquette to the Brule River, in township forty-two (42) north of range thirty-five (35) west, sufficient to cover one hundred and sixty-one thousand one hundred and four and thirty-eight one-hundredths acres (161,104.38) of land as approved by certificate thereof filed in the General Land Office of the United States on the 12th day of December, 1861, which the said Peninsula Railroad Company may

have acquired under the grant and location aforesaid and the transfer thereof to said company as lie between the mouth of the Brule River and the township line, between ranges numbers twenty-eight and twenty-nine west of the meridian of Michigan."

On February 21, 1867, the legislature of Michigan passed a joint resolution (1 Laws of Michigan, 1867, 317) in words following :

" *Whereas*, By act of Congress, approved June third, eighteen hundred and fifty-six, there was made, among other grants to this State, a grant of land to aid in the construction of a railroad from Marquette to the Wisconsin state line; *and whereas*, by joint resolution of Congress, approved July fifth, eighteen hundred and sixty-two, a change of the route of said road was authorized, and in fact has been made; *and whereas*, the company have executed a release of said land to the governor; therefore,

" *Resolved by the Senate and House of Representatives of the State of Michigan*, That the governor be and he is hereby authorized to execute and file the certificate of non-incumbrance and surrender to the United States of the land on the original line of said railroad, required by said joint resolution."

On January 31, 1868, a further release was executed by the Chicago and Northwestern Railway Company, with which the Peninsula Company had theretofore consolidated, which release commences with this recital :

"Whereas by act of Congress of the United States, approved on the third day of June, A.D. 1856, entitled ' A bill making a grant of lands to the State of Michigan in alternate sections to aid in the construction of railroads in said State,' every alternate section of land designated by odd numbers for six sections in width on each side of said roads, was granted to said State of Michigan to aid in the construction of railroads from Marquette to the Wisconsin state line."

And then, after reciting various acts and resolutions of Congress and the State of Michigan, hereinbefore referred to, proceeds as follows :

" And whereas lists of said railroad lands granted by said act of 1856 to aid in the construction of said railroad from Marquette to the Wisconsin state line, as the same was originally located, have been filed in the General Land Office :

" Now, therefore, the said Chicago and Northwestern Railway Company, in consideration of the premises, does hereby remise, release, and forever quitclaim unto the said State of Michigan, and its assigns forever all the right, title, and interest it now has or has ever had in and to the following pieces or parcels of land situate, lying, and being in the said State of Michigan, and conveyed and certified to said State in accordance with the several acts of Congress hereinbefore specifically referred to — that is to say : (Here follow the descriptions of lands embraced in three of the lists hereinbefore mentioned, to wit : First, the lands within the six-miles clear limits of the railroad from Marquette to the Wisconsin state line, containing 112,145.38 acres ; second, lists of lands within the six-miles limits of the lines of railroad from Ontonagon to the state line, and from Marquette to the state line, where they intersect and cross each other, containing 41,649.25 acres ; third, list of lands within the six-miles limits of the line of railroad from Ontonagon to the Wisconsin state line, and the Marquette and Ontonagon railroad, where they intersect and cross each other, containing 32,305.93 acres.) "

None of the lands within the " clear " limits of the road from Ontonagon to the state line were included in this release. On May 1, 1868, the governor of the State of Michigan executed to the United States a release of the same lands by an instrument containing substantially the same recitals. These releases seem to have been forwarded by the solicitor of the Chicago and Northwestern Railway Company to the Commissioner of the General Land Office at Washington, who answered on July 13, 1868, acknowledging the receipt and approving the releases as good for the lands described therein, but adding this reference to the lands within the " clear" limits of the Ontonagon road : " I have to invite your attention to a list of lands, embracing 142,430.23 acres, certified to the State December 21, 1861, for the branch line to Ontonagon, which

are omitted in the aforesaid release. The state and railroad company are requested to execute a similar release for said lands, which will complete the whole matter for both branches."

Some correspondence followed between the commissioner and the solicitor, and, the list having been furnished by the former to the latter, the Chicago and Northwestern Railway Company, on June 17, 1870, executed a formal release of these lands to the State of Michigan. This instrument in its recitals referred to the various acts and resolutions of the State of Michigan and the United States mentioned in the former releases, and recited that this was also made in consideration thereof. Thereafter, and on August 14, 1870, the governor of the State of Michigan likewise executed a formal release of the same lands to the United States. On May 29, 1873, the Commissioner of the General Land Office gave notice to the officers of the local land office that these last-named lands were restored to the public domain. but on July 30 following countermanded by telegraph such order of restoration. The telegram was sent upon the receipt of a letter from the then governor of the State of Michigan, notifying the Land Department that the release executed by the former governor of the lands within the "clear" limits of the Ontonagon and State Line road was unauthorized and void, because not within the scope of the resolution passed by the legislature, and also claiming that the lands still belonged to the State. On March 11, 1878, the Commissioner of the General Land Office addressed a letter to the Secretary of the Interior, which was by him referred to Congress, calling attention to the condition of this grant. After stating the facts in the case, the commissioner closes his letter in these words:

"Upon an examination of the case it appears, in my opinion, that my predecessor erred in demanding deeds of relinquishment of the lands granted for the Ontonagon and State Line Railroad Company from the Chicago and Northwestern Railroad Company and the governor of Michigan, as there does not appear to have been any action taken either by the board of control or the state legislature to transfer the grant originally made for the Ontonagon and State Line railroad to

the said Chicago and Northwestern Railroad Company or to authorize the governor of Michigan to make such a deed, and the title to said lands appears to be in the State of Michigan, under the original grant per act of June 3, 1856, and the subsequent approval made thereunder, as stated in the enclosed letter of Governor Bagley, except such portion thereof as has since been granted to the Marquette and Ontonagon Railroad Company.

" In view of the fact that the railroad from Ontonagon to the Wisconsin state line has not been built, and of the terms of the granting act of 1856, and the confirmatory act of the Michigan legislature of February 14, 1857, the grant originally made for said road became liable to reversion more than ten years since, and in view of the further fact that neither the state legislature nor the board of control have ever conferred the said grant upon any other party or parties, and that at present there is no party or corporation *in esse* proposing to build a railroad upon this line, I would respectfully recommend that the attention of Congress be called to the present status of these lands with a view to such action as may be necessary to restore the same to market."

On September 10, 1880, the Ontonagon and Brule River Railroad Company was organized under the laws of the State of Michigan, and on September 17, 1880, the board of control of the State passed a resolution declaring the grant to the Ontonagon Company forfeited, and bestowing it upon the Ontonagon and Brule River Railroad Company, which grant was accepted by the directors of that company on October 25. It appears that this company built about twenty miles of road from Ontonagon south, but never completed the road to the state line, nor opposite the land in controversy, nor did it ever receive any of the lands embraced in the grant.

The narration thus far develops the title of the land in controversy so far as it is determined by the railroad grant legislation, and action taken thereunder. Turning now to the canal land grant legislation, the following is its history : On March 3, 1865, Congress passed an act, c. 202, 13 Stat. 519, giving to the State of Michigan authority to locate and con-

struct a ship canal through the neck of land between Lake Superior and Portage Lake, and granting in aid thereof "two hundred thousand acres of public lands, to be selected in subdivisions agreeably to the United States survey, by an agent or agents appointed by the governor of said State, subject to the approval of the Secretary of the Interior, from any lands in the upper peninsula of said State, subject to private entry: *Provided*, That said selections shall be made from alternate and odd-numbered sections of land nearest the location of said canal in said upper peninsula, not otherwise appropriated, and not from lands designated by the United States as 'mineral' before the passage of this act, nor from lands to which the rights of preëmption or homestead have attached."

This was a grant *in præsenti*, the language being: "That there be, and hereby is, granted to the said State of Michigan." The fifth section of the act provided that if the work was not completed within two years, the lands granted should revert to the United States. On March 18, 1865, the legislature of the State of Michigan accepted this grant, and conferred it upon the Portage Lake and Lake Superior Ship Canal Company. Laws of Michigan, 1865, No. 216, 474. On July 3, 1866, Congress passed another act, making an additional grant of 200,000 acres, 14 Stat. 81, the language of which act is as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there be, and hereby is, granted to the State of Michigan, to aid in the building of a harbor and ship canal at Portage Lake, Keweenaw Point, Lake Superior, in addition to a former grant for that purpose, approved March the third, eighteen hundred and sixty-five, two hundred thousand acres of land in the upper peninsula of the State of Michigan, and from land to which the right of homestead or preëmption has not attached: *Provided,* That one hundred and fifty thousand acres of said lands shall be selected from alternate odd-numbered sections, and fifty thousand acres from even-numbered sections of the lands of the United States. Said grant of lands shall inure to the use and benefit of the Portage Lake and Lake Superior

Ship Canal Company, in accordance with an act of the legislature of the State of Michigan, conferring the land granted to the said State, by the act herein referred to, on said company: *And provided further*, That the time allowed for the completion of said work and the right of reversion to the United States, under the said act of Congress, approved March the third, eighteen hundred and sixty-five, be extended three additional years: *And provided further*, That no lands designated by the United States as 'mineral' before the passage of this act shall be included within this grant."

The canal was completed and the final certificate of completion given by the governor on June 25, 1875. Prior thereto, and on July 1, 1865, the canal company executed a mortgage of the lands embraced in the first grant; on July 1, 1868, a second mortgage, covering the lands included within the second grant; and on July 1, 1870, a third mortgage, covering all defendant's property. By foreclosure proceedings the title to all this property became vested in the plaintiff in error. An agent on the part of the State was duly appointed to make the selection of lands covered by these two grants. Among the lands selected by him was the tract in controversy, which was, in 1871 and after the second release executed by the governor of the State of Michigan, certified by the Land Department to the State in part satisfaction of the canal grant. This tract was from 1880 to 1888 assessed to the plaintiff for state, county, township and other taxes, and such taxes, amounting in the aggregate to $187.26, paid by it.

On March 12, 1888, the defendant settled upon the tract in controversy, and has ever since continued in possession. On May 25, 1888, he applied to the local land office to enter the lands under the preëmption law, stating in his application that he had lived with his family on the land since the 28th of March prior. This application was rejected on the ground that the land had been selected and certified to the State of Michigan in satisfaction of the canal grant. On March 2, 1889, Congress passed an act, c. 414, 25 Stat. 1008, the material portions of which are as follows:

" SEC. 1. That there is hereby forfeited to the United States, and the United States hereby resumes the title thereto, all lands heretofore granted to the State of Michigan by virtue of an act entitled ' An act making a grant of alternate sections of the public lands to the State of Michigan to aid in the construction of certain railroads in said State and for other purposes,' which took effect June third, eighteen hundred and fifty-six, which are opposite to and coterminous with the uncompleted portion of any railroad, to aid in the construction of which said lands were granted or applied, and all such lands are hereby declared to be a part of the public domain. . . .

" SEC. 2. That nothing . . . *And provided further*, That this act shall not be construed to prejudice any right of the Portage Lake Canal Company, or the Ontonagon and Brule River Railroad Company, or any person claiming under them, to apply hereafter to the courts or to Congress for any legal or equitable relief to which they may now be entitled, nor to prejudice any right of forfeiture, as hereby declared, or recovery of the United States in respect of any of the lands claimed by said companies, nor to the prejudice of the right of any person claiming adversely to said companies or their assigns, under the laws of the United States.

. " SEC. 3. That in all cases when any of the lands forfeited by the first section of this act, or when any lands relinquished to, or for any cause resumed by, the United States from grants for railroad purposes, heretofore made to the State of Michigan, have heretofore been disposed of by the proper officers of the United States or under state selections in Michigan, confirmed by the Secretary of the Interior, under color of the public land laws, where the consideration received therefor is still retained by the government; the right and title of all persons holding or claiming under such disposals shall be, and is hereby confirmed : *Provided, however*, That where the original cash purchasers are the present owners this act shall be operative to confirm the title only of such said cash purchasers as the Secretary of the Interior shall be satisfied have purchased without fraud and in the belief that they were thereby obtaining valid title from the United States. That nothing

herein contained shall be construed to confirm any sales or entries of lands, or any tract in any such state selection, upon which there were *bona fide* preëmption or homestead claims on the first day of May, eighteen hundred and eighty-eight, arising or asserted by actual occupation of the land under color of the laws of the United States, and all such preëmption and homestead claims are hereby confirmed.

"SEC. 4. That no lands declared forfeited to the United States by this act shall inure to the benefit of any State or corporation to which lands may have been granted by Congress except as herein otherwise provided; nor shall this act be construed to enlarge the area of land originally covered by any such grant, or to waive or release in any way any right of the United States now existing to have any other lands granted by them, as recited in the first section, forfeited for any failure, past or future, to comply with the conditions of the grant. Nor shall the moiety of the lands granted to any railroad company on account of a main and a branch line appertaining to uncompleted road, and hereby forfeited, within the conflicting limits of the grants for such main and branch lines, when but one of such lines has been completed, inure, by virtue of the forfeiture hereby declared, to the benefit of the completed line."

*Mr. John F. Dillon,* (with whom was *Mr. Daniel H. Ball* on the brief,) for plaintiff in error.

*Mr. Don M. Dickinson* for defendant in error.

MR. JUSTICE BREWER delivered the opinion of the court.

The act of June 3, 1856, was a grant *in præsenti,* and when by the filing of the map of definite location the particular tracts were identified, the title to those lands was vested in the State of Michigan, to be disposed of by it in aid of the construction of a railroad between Ontonagon and the Wisconsin state line. The lands were withdrawn from the public domain, and no longer open to settlement by individuals for preëmp-

tion or other purposes. Although there was a provision for the forfeiture of the lands if the road was not completed within ten years, such provision was a condition subsequent, which could be enforced only by the original grantor, the United States. And until, in some appropriate method, it asserted its right of forfeiture, the title remained in the State of Michigan or the corporations upon which, from time to time, it conferred the benefit of the grant. *Schulenberg* v. *Harriman,* 21 Wall. 44; *United States* v. *Southern Pacific Railroad,* 146 U. S. 570; *United States* v. *Northern Pacific Railroad,* 152 U. S. 284. The case of *Schulenberg* v. *Harriman* is exactly in point. In that case was considered a land grant to the State of Wisconsin — a grant with a provision for forfeiture of the lands on a failure to construct the road. After a full consideration of the question, Mr. Justice Field, delivering the opinion of the court, summed up the result in these words: "In the present case no action has been taken either by legislation or judicial proceedings to enforce a forfeiture of the estate granted by the acts of 1856 and 1864. The title remains, therefore, in the State as completely as it existed on the day when the title by location of the route of the railroad acquired precision and became attached to the adjoining alternate sections."

Again, the grant made by the act of June 3, 1856, to the State of Michigan contemplated separate railroads from Ontonagon to the state line, and from Marquette to the state line. This is obvious from the language of the act. The legislature of the State of Michigan treated it as such, and conferred the grant on two separate corporations. And this distinction has since been recognized again and again, both by the State and United States, down to and including the confirmatory act of Congress of March 2, 1889, in which the "Ontonagon and Brule River Railroad Company" is mentioned as one of the companies whose rights were not to be prejudiced by the forfeiture.

Prior to the act of Congress of March 2, 1889, there was on the part of the United States no legislative or judicial proceeding looking to a forfeiture of these lands, or a retransfer

of them to the United States. Up to that time, therefore, they remained the property of the State of Michigan, to be used by it in aid of the construction of a railroad between Ontonagon and the Wisconsin state line. Whatever changes were made by the State as to the beneficiary of such grant, whatever releases may have been executed by any such beneficiary to the State, they in no manner operated to retransfer the lands to the United States. It is true that the governor of the State at one time executed a formal release of them to the United States, but such release was beyond his power. The only authority which he had in the matter was that conferred by the resolution of the legislature of the State of Michigan of February 21, 1867, which described other lands. Indeed, the instrument which the governor executed, in terms referred to that legislation as his authority, so that no one, after examination, could have been misled.

Further, the grant to the State of Michigan was to aid in the construction of a railroad. Affirmatively, it was declared in the acts of Congress that the lands should be applied by the State to no other purpose. Even if there had been no such express declaration, such a limitation would be implied from the declaration of Congress that it was granted for the given purpose. As the State of Michigan had no power to appropriate these lands to any other purposes, certainly no act of any executive officer of the State could accomplish that which the State itself had no power to do.

The railroad grant, the filing of the map of definite location, and the certification of the lands to the State were all before the canal grant, so that at that time these lands were identified, separated from the public domain, appropriated to a particular purpose, and not to be considered as within the scope of any subsequent grant by Congress, unless in terms made so. General terms in a subsequent grant are always held to not include lands embraced within the terms of the prior grant. Even a patent may be declared void if issued for lands theretofore reserved from sale. This is the settled rule of this court. *Wilcox* v. *Jackson*, 13 Pet. 498; *Stoddard* v. *Chambers*, 2 How. 284; *Bissell* v. *Penrose*, 8 How.

317; *Minter* v. *Crommelin*, 18 How. 87; *Easton* v. *Salisbury*, 21 How. 426; *Reichart* v. *Felps*, 6 Wall. 160; *Morton* v. *Nebraska*, 21 Wall. 660; *Shepley* v. *Cowan*, 91 U. S. 330; *Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733; *Newhall* v. *Sanger*, 92 U. S. 761; *Sherman* v. *Buick*, 93 U. S. 209; *Smelting Co.* v. *Kemp*, 104 U. S. 636; *Steel* v. *Smelting Co.*, 106 U. S. 447; *Reynolds* v. *Iron Silver Mining Co.*, 116 U. S. 687; *Wright* v. *Roseberry*, 121 U. S. 488; *Doolan* v. *Carr*, 125 U. S. 618.

From these cases we make these two quotations, as clearly setting forth the law applicable to this question. In *Smelting Company* v. *Kemp* (*supra*) it was said, p. 641:

" Of course, when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States, and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed."

And in *Doolan* v. *Carr*, p. 624:

" There is no question as to the principle that where the officers of the government have issued a patent in due form of law, which on its face is sufficient to convey the title to the land described in it, such patent is to be treated as valid in actions at law, as distinguished from suits in equity, subject, however, at all times to the inquiry whether such officers had the lawful authority to make a conveyance of the title. But if those officers acted without authority; if the land which they purported to convey had never been within their control, or had been withdrawn from that control at the time they undertook to exercise such authority, then their act was void — void for want of power in them to act on the subject-matter of the patent, not merely voidable."

Counsel for plaintiff in error cite several cases in which, power having been given to the Secretary of the Interior to determine a question of fact, his determination thereof, as expressed by the issue of a patent, was held conclusive. The latest of those cases is *Barden* v. *Northern Pacific Railroad*, 154 U. S. 288, in which the rule was thus stated, p. 327 :

" It is the established doctrine, expressed in numerous decisions of this court, that wherever Congress has provided for the disposition of any portion of the public lands, of a particular character, and authorizes the officers of the Land Department to issue a patent for such land upon ascertainment of certain facts, that department has jurisdiction to inquire into and determine as to the existence of such facts, and in the absence of fraud, imposition, or mistake, its determination is conclusive against collateral attack."

That case fully illustrates the extent to which the rule goes. The grant to the Northern Pacific was of lands "non-mineral," and it was held that it was a question of fact whether lands were mineral or non-mineral, and that question of fact was for the determination of the Land Department, and when determined by it, conclusively settled. But those cases are not pertinent, for here there was no question of fact to be determined. Long prior to any legislation respecting the canal grant the lands granted to the Ontonagon Company had been identified and set apart. The record thereof was in the office of the Land Department. By that identification and certification those lands were absolutely separated from the public domain, and as fully removed from the control of the Land Department as though they had been already patented to the State. And whether those lands were or were not returned to the United States, and released from the burden of that grant, was not a question of fact, but one of law, and depended upon the construction to be given to the resolution of the State of Michigan of February 21, 1867.

Much reliance is placed by counsel in brief and argument upon the " obvious intent " and the " general understanding." It is said that, as indicated by the provisions of the two acts of June 3, 1856, the original plan was the construction of a

main line from Fond du Lac northerly to the state line, and thence in two branches to Marquette and Ontonagon, on Lake Superior; that when this plan was changed, and the route from Fond du Lac to the state line abandoned and a new route farther eastward substituted in its place, it was to be expected that the original branches would likewise be changed to something to connect with the new main line; that it cannot be supposed that Congress would contemplate the building of a road from Ontonagon southerly to the Wisconsin state line, with no connections at that place with any other road, and that hence, although only the Marquette line is mentioned in the resolutions of Congress and of the state legislature as abandoned, etc., both the Marquette and Ontonagon branches must have been intended. It is insisted that all parties, the railroad companies, the State, and the Land Department of the United States, so understood the scope of the resolutions, and acted upon that understanding. But it does not follow, because the main line in Wisconsin was moved eastward, that Congress deemed it unwise or unnecessary to attempt to reach the waters of Lake Superior at Ontonagon. It may have supposed that the aid already granted to the Ontonagon line, and which it did not in terms disturb, was sufficient to insure its construction to a junction with the new main line; or, it may have thought that a line simply opening that part of the State of Michigan to the waters of Lake Superior deserved Congressional aid. In the original act granting aid to the State of Michigan four lines or roads are named in a single sentence. When Congress, by subsequent legislation, selects one only of those lines, and relocates that, it is going very far to say that Congress must have intended to abandon one or all of the other three, and to withdraw the aid which it had granted for their construction. Neither can it be said that there has been any "general understanding." True, the Northwestern Railway Company, when called upon, executed to the State a release of its interest in the lands granted to aid in the building of the Ontonagon line, but that might well be because it had no thought of constructing any such line, and had no desire to hold on to a grant which it did

not intend to use. It may be conceded that there has been some confusion in the rulings of the department, and in the action of the state officials. Nevertheless there has been no uniform interpretation of the condition of things as is claimed by counsel. On the contrary, there were frequent assertions of right by the State; efforts by it to utilize the grant to the Ontonagon Company in the construction of the proposed road. It cannot be said that there has been general acquiescence in one interpretation. So, after all, as there is no pretence of any proceeding in the way of forfeiture by the United States prior to the act of March 2, 1889, the question must depend upon the scope and effect of the action of the legislature of the State of Michigan; and that, as we have seen, only contemplated a release of the grant so far as it was to aid in the construction of the Marquette and State Line road.

It follows from these considerations that at the time of the passage of the act of March 2, 1889, neither the plaintiff nor defendant had any right or title to the tract in controversy. It, like other lands within the Ontonagon grant, belonged to the State of Michigan, to be disposed of by that State only in aid of the construction of a railroad, and subject to forfeiture by the United States for failure to construct the road.

We come, therefore, to the final question, and that is, the true construction of the act of March 2, 1889.

The first section simply declares a forfeiture of the lands opposite to and coterminous with the uncompleted portion of any railroad in aid of which the grant of 1856 was made. So far as the parties to this controversy are concerned, that is the whole significance of the section. As to them it grants nothing and withdraws nothing. And as at the time of the passage of the act neither settler nor company had any right or title to the lands, if this were the only section it would operate simply to resume the title to the United States, clear the lands of all pretence of adverse claims, and add them to the public domain, to be thereafter disposed of as other public lands are disposed of. The second and third sections are the troublesome parts of the act, and it must be conceded that the true construction is not altogether obvious, and yet when

the situation as it existed and as it was known to Congress
is considered, the meaning can be satisfactorily discerned.
Some of the lands had been selected and certified to the State
of Michigan by the officers of the Land Department in part
satisfaction of the canal grant. Some were occupied by set-
tlers claiming the right of preëmption and homestead, and of
these some were lands which had been selected and certified
to the State. Possibly some were claimed by the State, or
individuals under the Swamp Land Act, or other acts of Con-
gress. Congress knew that these lands, the title to which it
was purposing to resume discharged of all right on the part
of the State of Michigan to use them in aid of the construc-
tion of a railroad, were already subject to other and conflict-
ing claims, of no legal validity, yet of a character justifying
consideration. Under those circumstances, with the view of
securing an equitable adjustment of these conflicting claims,
it enacted the second and third sections of this act. It will
be more convenient to consider the third section first. That
recognizes that certain of these lands had " heretofore been
disposed of by the proper officers of the United States or
under state selections in Michigan confirmed by the Secretary
of the Interior, under color of the public land laws," and de-
clares that if the " consideration received therefor is still
retained by the government," the title of the lands thus dis-
posed of " shall be and is hereby confirmed." Now, there
had been, as appears, state selections in Michigan of a por-
tion of these lands for the canal company, which selections
had been confirmed by the Secretary of the Interior, and such
selections were made under color of the acts of Congress
making the canal grant. This makes a case apparently within
the scope of the confirmation. But this is denied, because,
first, the selections were under color of special grants to aid
in the construction of the canal, and not under color of the
general laws in respect to the disposal of public lands ; and,
secondly, because the government received no consideration
therefor, and of course cannot be said to still retain that
which it never received. This view is, as is claimed, also sup-
ported by the proviso immediately following, to wit, " that

where the original cash purchasers are the present owners," etc., as though the confirmation was intended to apply to those only who had paid money to the government, and in that way had obtained a claim of title to the lands.   There is some force to this contention, but we think it places too narrow a construction upon the language.   It does not appear from this record, except inferentially from a letter of the Commissioner of the General Land Office, that there were any selections of lands within the railroad grant made by the State otherwise than in attempted satisfaction of the canal grant, and we are not aware of any act of Congress granting lands to the State of Michigan for any purpose, cash considerations for which were to be paid by the State, or received by the general government; while it does appear that the attention of Congress was called to the fact that selections had been made by the State and confirmed by the Secretary of the Interior of lands within this railroad grant for the purpose of satisfying the canal grant.   The language must be understood as intended by Congress to be applicable to the state of facts as it existed and was known to exist, and not to a state of facts which did not and could not exist.   Hence the term "public land laws," fairly construed, refers not simply to the statutes making general disposition of the public domain, but to any laws of Congress, special or general, by which public lands were disposed of.   So the phrase, "where the consideration received therefor is still retained by the government," is satisfied whenever the conditions of the attempted conveyances have been fully complied with.   Thus, if any of the lands had been disposed of by the proper officers of the government to individuals under the homestead laws, it could properly be held that the consideration received for such conveyances was still retained by the government, although, in fact, no money had been paid; for the consideration which the government had provided for the conveyance of such lands was the actual occupation by the homesteader for the specified period.   It will be difficult to discover any equitable reason why a preëmption claim should be confirmed and a homestead claim disallowed.   In like manner, where a

grant was made to the State in aid of the construction of some work of a public or quasi-public character, the construction of the work is the consideration of the grant, and when that is accomplished the consideration is received and retained by the government. Here it appears from the testimony that the canal was completed, and, therefore, the consideration of the grant was received and retained by the government. Any other construction than this would leave the provision as to state selections in Michigan, confirmed by the Secretary of the Interior, without significance. So, also, the proviso as to original cash purchasers is not to be taken as implying that the confirmation only extends to cash purchases, but, as making a further limitation as to some of those in whose behalf the confirmation is proposed, to wit, those who were cash purchasers and are still owners, the limitation being that as to them the act shall be operative only when, as is said, the Secretary of the Interior shall be satisfied that they purchased without fraud, and in the belief that they were obtaining valuable title from the United States. In other words, the rule of *bona fides* was applied to lands still held by the original cash purchaser. This, by implication, excluded from its operation lands held by proper conveyances without notice from the original purchasers. And this is the ordinary limit of the application of the rule of *bona fides.* It was, doubtless, deemed unnecessary to make a like provision as to state selections because fraud could not be imputed to the State. This construction, and this alone, gives operative force to all the clauses of this confirmatory clause as applied to the actual facts of the case, and should be received as the true construction. By this confirmatory clause, therefore, the title of the canal company was confirmed as to the lands selected and certified, with the approval of the Secretary of the Interior, in satisfaction of the canal grant.

The only limitation upon this confirmation is found in the closing sentence of that section. That provides that this confirmation shall not extend to any tracts "upon which there were *bona fide* preëmption or homestead claims on the first day of May, 1888, arising or asserted by actual occupation of

the land under color of the laws of the United States, and all such preëmption and homestead claims are hereby confirmed." Evidently, the intent of Congress was that in all cases of a conflict between a selection in aid of the canal grant and the claims of any settler, the confirmation should depend upon the state of things existing at a named date, to wit, May 1, 1888, that date being about ten months prior to the passage of the act. If at that time there were no *bona fide* preëmption or homestead claims upon any particular tract the title of the canal company was confirmed. If, on the other hand, there was then a *bona fide* preëmption or homestead claim, arising or asserted by actual occupation of the land under color of the laws of the United States, such preëmption or homestead claim was to have preference, and was confirmed. It was the purpose to not leave open to dispute between the parties any question as to the relative equities of their claims, but to fix a precise time, and to describe with particularity the conditions which must exist at that time in order to give the one priority over the other. As there could be no valid transfer of a preëmption or homestead claim, it was unnecessary to distinguish between such claimants and their grantees as was previously done in respect to cash purchasers. The claim of any settler coming within the scope of this clause was declared by it prior to the claim of the canal company, and was also as against the United States confirmed. So that, in any dispute which in this case arises, we must look to the condition of things on the 1st of May, 1888, in order to determine whether the defendant's homestead claim or the certification to the canal company was confirmed.

Before passing to an inquiry as to this question of fact, it is necessary to refer to those provisions of section 2 which, it is insisted, are inconsistent with that confirmation of the canal selections which we have seen was the purpose of the fore part of section 3. Section 2, after clauses which have no bearing upon this question, names three distinct matters, which it is said are not to be construed as prejudiced by "this act." First, "any right of the Portage Lake Canal Company, or the Ontonagon and Brule River Railroad Company, or any person

claiming under them to apply hereafter to the courts or to Congress for any legal or equitable relief to which they may now be entitled." It will be borne in mind that it is "this act" — not the forfeiture, not the confirmation, nor any separate provision of the act, but the act as a whole, including therein both forfeiture and confirmation, which is not to work any prejudice. Obviously the clause quoted does not exclude the idea of some confirmation, but means simply that neither forfeiture nor confirmation, nor any other provision in the act, shall be construed as a final settlement of all the claims, legal and equitable, of the companies or their grantees. If, for instance, the canal company, accepting the confirmation provided by section 3, should fail of getting all the lands selected and certified to it, and so receiving the full amount of the grant, (as from the conclusion we have reached in this particular case it seems that it does,) then its acceptance is not to be taken as an estoppel against any subsequent claim to Congress for the deficiency caused thereby. So if, between any of the parties affected by this confirmation, there should be controversies in which on the part of one or the other there were any legal or equitable claims not arising out of this confirmatory legislation of Congress, they were not to be precluded from litigating such claims in the courts. In other words, the confirmation is in such a case to be regarded as nothing but a confirmation, and without further effect or significance.

The second matter which the act was not to prejudice was "any right of forfeiture, as hereby declared, or recovery of the United States in respect of any of the lands claimed by said companies." The meaning of this clause is not so clear. A reasonable construction is that all the provisions in the act, including both the forfeiture and the special confirmation named in section three, are not to prejudice any right of recovery which the United States may have as against any lands claimed by the companies. That is, if there be any lands within the scope of the original railroad grant of 1856, to which any or either of these companies make any claims, and which are not clearly protected by the confirmation men-

tioned in the third section, the full rights of the government in respect to such lands may be enforced irrespective of such section. While the language is a little obscure, it ought not to be construed as denying the confirmation which seems to be granted by the third section, and those words in that, which are reasonably clear in their meaning, should not be overthrown by language of doubtful import like this. The only other construction would exclude the companies named from any benefit of the confirmatory provisions. This construction would, of course, compel an affirmance of this judgment as showing that the plaintiff had no title to the land, and was, therefore, in no position to question the defendant's possession.

The third matter is that the act shall not be construed "to the prejudice of the right of any person claiming adversely to said companies or their assigns, under the laws of the United States." This means that the confirmation to the companies shall not be taken as an attempt to invalidate any legal or equitable rights of any one as against such companies. If anything had happened through contract, or otherwise, giving to the individual a legal or an equitable claim as against the companies, such legal or equitable right was not to be affected by anything in this act. But that, so far from conflicting with the idea of a confirmation, rather assumes that there is one, and aims to determine its effect rather than deny its existence. There is, therefore, nothing in any of these provisions to overthrow the construction given to the third section, or which conflicts with the confirmation therein provided.

We pass, therefore, finally to the question of fact in respect to the defendant's homestead claim. It appears that he entered upon the lands in March, 1888, but did not attempt to make an entry in the land office until May 25, 1888. While the term "homestead claim" is sometimes used to denote the mere formal application at the local land office, obviously this is not the purport of the term as used in this section, for it is defined by the succeeding words, "arising or asserted by actual occupation of the land." This obviously includes cases in which the party was, on the 1st of May, 1888, in the actual

occupation of the land, with a view of making a homestead of it under the laws of the United States.

But it is said by the counsel for the company that it was not a *bona fide* homestead claim because at the time the defendant entered upon the land he understood that it was a part of a railroad grant. The testimony of the defendant is all that there is bearing upon the question of *bona fides*. And while it appears from his testimony that he understood at the time of his entry that it was land embraced within a railroad land grant, he also testifies that he expected that the grant would be removed and that he could then enter the land, and that he went there for the purpose of making it a home. Now, it may be true as a general proposition that a man cannot move upon land which he knows belongs to another and establish a *bona fide* claim by such wrongful entry, but we do not think that that rule is applicable to the case at bar. The sense in which "*bona fide*" is used in this clause is indicated by the provision in the one preceding as to cash purchasers. Their purchases were to be protected if made "without fraud and in the belief that they were thereby obtaining valid title from the United States." It does not appear that he knew the exact condition of the outstanding claims. If he did, he knew that this railroad grant had been outstanding thirty-two years, that the land was to be restored to the government if the road was not completed within ten years, and that twenty-two years had passed since the time fixed by Congress for the completion of the road, and nothing had been done. His expectation was (and under the circumstances not an unreasonable one) that Congress would at some near time interfere to remove all this outstanding claim. Under those circumstances, and in expectation of such removal, he enters upon the land. Can it be said that this entry and occupation was with a view of depriving anybody of title, or that it was, as against the company, a wrongful entry? If the construction contended for were accepted, it would exclude from the benefit of the act any settler upon these lands who knew that the land he entered upon was within the railroad grant. But legislation respecting public

lands is to be construed favorably to the actual settler, and the construction contended for by the canal company seems to us too narrow. If a party entering upon a tract, although he knew that it was within the limits of an old railroad grant, did so under the honest belief and expectation that that grant, if not technically extinguished by lapse of time, had remained so long unappropriated by any beneficiary that Congress would shortly resume it, and in that belief determined to make for himself a home thereon, with a view of perfecting his title under the land laws of the United States when the forfeiture should be finally declared, it must be held, we think, that he is, within the terms of this confirmatory act, a *bona fide* claimant of a homestead. The ruling of the Circuit Court was correct, and the judgment in favor of the defendant is

*Affirmed.*