# JOHNSON *v.* DREW.

ERROR TO THE SUPREME COURT OF THE STATE OF FLORIDA.

No. 239. Submitted April 28, 1898. — Decided May 31, 1898.

The substantial rights of the defendant were not prejudiced by the ruling of the trial court sustaining the demurrer to the first equitable plea and refusing leave to file the second, and such ruling involved merely a question of state practice.

The evidence in the case shows that the particular lots of land described in the declaration were not embraced in the Fort Brooke reservation when the patent was issued.

A party cannot defend against a patent duly issued for land which is at the time a part of the public domain, subject to administration by the

land department, and to disposal in the ordinary way, upon the ground that he was in actual possession of the land at the time of the issue of the patent.

The act of Congress of July 5, 1884, c. 214, 23 Stat. 103, concerning the disposal of abandoned and useless military reservations, has no significance in this case, as the patent had issued and the title passed from the Government prior to its enactment.

In September, 1886, defendant in error commenced an action of ejectment in the Circuit Court of the State of Florida, for the county of Hillsborough, to recover possession of a tract of land described as follows:

" Lot eight (8) of section nineteen (19), township twenty-nine (29) south, of range nineteen (19) east, and lot seven (7) of section twenty-four (24), in township twenty-nine (29) south, of range eighteen (18) east, containing about forty and nineteen one-hundredths (40.19) acres."

The defendant, now plaintiff in error, filed a plea of not guilty and also a plea based on equitable grounds. A demurrer to this latter plea was sustained, and thereupon the defendant asked leave to file an amended equitable plea. This application was denied, the court holding that the grounds of defence set up therein were not sufficient. That plea alleged in substance that the plaintiff's title rested on a patent from the United States, issued on a location of Valentine scrip; that such scrip was, by the terms of the statute under which it was issued, to be located only upon unoccupied and unappropriated lands of the United States; that the land in controversy was, at the time of the location of the scrip, a part of Fort Brooke military reservation, and was also in the actual occupancy of the defendant. The case came on for trial in September, 1889, and the defendant offered evidence in support of all his defences, including therein the matters set up in the equitable plea which he had been refused leave to file. This testimony was held insufficient by the court, and the trial resulted in a verdict and judgment for the plaintiff, which judgment was thereafter, and in June, 1894, affirmed by the Supreme Court of the State; whereupon the defendant sued out this writ of error.

The Valentine Scrip Act was passed April 5, 1872, c. 89,

17 Stat. 649, and authorized the location of such scrip on "the unoccupied and unappropriated public lands of the United States, not mineral, and in tracts not less than the subdivisions provided for in the United States land laws." The patent to the plaintiff was issued September 30, 1882, and recited that it was upon a location of Valentine scrip, and in his equitable plea defendant averred that the patent was predicated upon an entry at the local land office of the United States at Gainesville, Florida. On August 18, 1856, Congress passed an act, c. 129, 11 Stat. 81, 87, containing this provision :

"That all public lands heretofore reserved for military purposes in the State of Florida, which said lands, in the opinion of the Secretary of War, are no longer useful or desired for such purposes, or so much thereof as said Secretary may designate, shall be, and are hereby, placed under the control of the General Land Office, to be disposed of and sold in the same manner and under the same regulations as other public lands of the United States : *Provided,* That said lands shall not be so placed under the control of said General Land Office until said opinion of the Secretary of War, giving his consent, communicated to the Secretary of the Interior in writing, shall be filed and recorded."

At that time there was in existence what was known as the Fort Brooke military reservation, near the town of Tampa, Florida. As appears from the testimony offered by the defendant, on July 24, 1860, the Secretary of War wrote to the Secretary of the Interior as follows:

"WAR DEPARTMENT, *July 24th,* 1860.

"SIR: Referring to the correspondence between the two departments on the subject, I have the honor to enclose to you a report of the Quartermaster General showing that Fort Brooke is now in readiness to be turned over to the Department of the Interior, in pursuance of the arrangements made to that effect.

"Very respectfully, your obedient servant,
"JOHN B. FLOYD, *Secretary of War.*"
"Hon. J. Thompson, Secretary of the Interior."

The enclosed report from the Quartermaster General stated that all the movable property of the Government had been sold, and that there was no reason why the military reservation should not be turned over to the Interior Department. Probably the exigencies of the war, which soon thereafter commenced, prevented any further action by either department, for on April 6, 1870, the following communication was sent by the Secretary of War to the Secretary of the Interior:

"WAR DEPARTMENT, WASHINGTON CITY, *April* 6, 1870.

"The honorable Secretary of the Interior.

"SIR: I have the honor to reply to a letter addressed to this department by the Commissioner of the General Land Office on the 26th ultimo relative to the public lands occupied by this department for military purposes at Fort Brooke, Florida, and to inform you that there is no longer any objection to their disposition by the General Land Office under the laws governing the subject.

"Very respectfully, your obedient servant,

"WM. W. BELKNAP, *Secretary of War.*"

From the date of this last communication up to 1877 the record discloses no action by either department, but in January, 1877, the Secretary of War requested that a military reservation at Fort Brooke be declared and set apart by the executive. Subsequently, and on May 29, 1878, the Secretary of War addressed a communication to the President as follows:

"WAR DEPARTMENT,
"WASHINGTON CITY, *May* 29*th*, 1878.

"To the President.

"SIR: In accordance with recommendation of commanding general department of the South, concurred in by division commanders, I have the honor to request that a military reservation at the post of Fort Brooke, Tampa, Florida, with boundaries as hereinafter described, may be duly declared and set apart by the executive in lieu of the lands at that post reserved by executive order dated January 22, 1877, to wit: Beginning at the intersection of the line which bounds the

town of Tampa on the south with the Hillsborough River, running thence along said line which bounds the town of Tampa on the south, and in prolongation thereof north 68 degrees 45 minutes east 2976 feet; thence north 4 degrees 28 minutes west 2342 feet; thence north 38 degrees east 1052 feet; thence south 52 degrees east 459.2 feet; thence south 38 degrees west 1052 feet; thence south 4 degrees 28 minutes east 1931 feet; thence south 5 degrees 29 minutes east 2007.2 feet to the Hillsborough Bay; thence westerly along the shore of Hillsborough Bay and the shore of Hillsborough River to the place of beginning, containing 155 and one half acres, more or less. A plat of the reservation and report and notes and survey by Lieutenant James C. Bush, 5th artillery, are enclosed. herewith.

"I have the honor to be, sir, with great respect,

"Your obedient servant,

"GEO. W. McCRARY, *Secretary of War.*"

This request was approved, and the reservation was made and declared accordingly. The plat, notes and survey referred to in this letter were not introduced in evidence, so that the exact boundaries of the reservation then ordered were not distinctly shown, nor can it be determined from the description in the letter alone whether it included the lands in controversy. In March, 1883, this last reservation was abandoned, and the land again turned over to the Interior Department. Defendant also offered a diagram, certified by the Commissioner of the Land Office, of sections 18 and 19 of township 29, range 19, and section 24 of township 29, range 18, which, as the record recites, "shows the contiguity of the land in question to that portion of the Fort Brooke military reservation last relinquished by the Secretary of War to the Secretary of the Interior." The diagram is not very definite, and it is difficult to determine therefrom the boundaries of either the earlier or later Fort Brooke military reservation. The defendant also offered evidence tending to show that he entered into occupation of the tract in controversy in 1871, and had continued in occupancy ever since.

*Mr. Samuel Y. Finley* for plaintiff in error.

*Mr. C. M. Cooper* and *Mr. J. C. Cooper* for defendant in error.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The ruling of the trial court in sustaining the demurrer to the first equitable plea and refusing to permit the second to be filed presents no question for the consideration of this court, for it was held by the Supreme Court of the State that under the plea of not guilty all the matters of defence set up in these equitable pleas could be offered in evidence and made available; and, in fact, the defendant on the trial did offer his testimony to establish them. So the substantial rights of the defendant were not prejudiced, and the ruling involved merely a question of state practice.

We pass therefore to a consideration of the merits of the case: Was the land within the limits of any military reservation at the time that it was patented? The Supreme Court of the State said in respect to this matter:

" There is doubt whether the documentary evidence offered by the defendant shows that the particular lots of land described in the declaration were embraced in the Fort Brooke reservation when the patent was issued."

It is clear to us that they were not. The description of the reservation asked for in the letter of May 29, 1878, from the Secretary of War to the President, is not of itself sufficient to show whether the land was within or without the limits of such reservation. The plat, notes and survey were not in evidence. But the record recites that the diagram, certified by the Commissioner of the Land Office, " shows the contiguity of the land in question." If contiguous it was not within, and while the diagram is unsatisfactory, yet it tends to support this statement of the record. Again, the testimony of the defendant is that he entered into possession of this land in 1871, which was before the reservation was established, and

continued in such possession until after the restoration in 1883, and this is in accord with the averments in the equitable plea. This also indicates that the land was not included in any government reservation. Further and finally, the plat on file in the General Land Office, and a part of the public records, puts the question at rest and locates the land outside the reservation. Hence, as shown by the testimony and by the public records, this land ever since 1870 has been part of the public lands of the United States, and subject to disposal in accordance with the general land laws. It was unappropriated land within the meaning of the act of 1872.

It being so a part of the public domain, subject to administration by the land department and to disposal in the ordinary way, the question arises whether a party can defend against a patent duly issued therefor upon an entry made in the local land office on the ground that he was in actual possession of the land at the time of the issue of the patent? We are of opinion that he cannot. It appears from the testimony that the defendant, although in occupation of this land, as he says, from 1871, never attempted to make any entry in the local land office, never took any steps to secure a title, and in fact did nothing until after the issue of a patent, when he began to make inquiry as to his supposed rights. But whether a party was or was not in possession of a particular tract at a given time is a question of fact, depending upon parol testimony; and if there is any one thing respecting the administration of the public lands which must be considered as settled by repeated adjudications of this court, it is that the decision of the land department upon mere questions of fact is, in the absence of fraud or deceit, conclusive, and such questions cannot thereafter be relitigated in the courts. The law in reference to this matter was summed up in the case of *Burfenning* v. *Chicago, St. Paul &c. Railway*, 163 U. S. 321, 323, as follows:

"It has undoubtedly been affirmed over and over again that in the administration of the public land system of the United States questions of fact are for the consideration and judgment of the land department, and that its judgment thereon is final. Whether, for instance, a certain tract is

swamp land or not, saline land or not, mineral land or not, presents a question of fact not resting on record, dependent on oral testimony ; and it cannot be doubted that the decision of the land department, one way or the other, in reference to these questions is conclusive and not open to relitigation in the courts, except in those cases of fraud, etc., which permit any determination to be reëxamined. *Johnson* v. *Towsley*, 13 Wall. 72 ; *Smelting Company* v. *Kemp*, 104 U. S. 636 ; *Steel* v. *Smelting Company*, 106 U. S. 447 ; *Wright* v. *Roseberry*, 121 U. S. 488 ; *Heath* v. *Wallace*, 138 U. S. 573 ; *McCormick* v. *Hayes*, 159 U. S. 332.

"But it is also equally true that when by act of Congress a tract of land has been reserved from homestead and preemption, or dedicated to any special purpose, proceedings in the land department in defiance of such reservation or dedication, although culminating in a patent, transfer no title, and may be challenged in an action at law. In other words, the action of the land department cannot override the expressed will of Congress, or convey away public lands in disregard or defiance thereof. *Smelting Company* v. *Kemp*, 104 U. S. 636, 646 ; *Wright* v. *Roseberry*, 121 U. S. 488, 519 ; *Doolan* v. *Carr*, 125 U. S. 618 ; *Davis' Admr.* v. *Weibbold*, 139 U. S. 507, 529 ; *Knight* v. *U. S. Land Association*, 142 U. S. 161."

Reference is made in the brief to the act of Congress, of July 5, 1884, c. 214, 23 Stat. 103, concerning the disposal of abandoned and useless military reservations. But obviously that statute can have no significance in this case, for the patent had issued and the title passed from the Government prior to its enactment. We see no reason to doubt that upon the facts in this case the judgment of the Supreme Court of Florida was right, and it is, therefore,

*Affirmed.*