# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### EDWARDS v. BEGOLE.

(Circuit Court of Appeals, Sixth Circuit.   March 9, 1903.)

### No. 1,073.

**1. PUBLIC LANDS—CONSTRUCTION OF STATUTE—CONFIRMATION OF HOMESTEAD CLAIMS ON FORFEITED RAILROAD GRANT.**

By Act March 2, 1889 (25 Stat. 1008), forfeiting certain unearned land grants in the state of Michigan, prior sales or dispositions of any of such lands by the Land Department under color of the public land laws were confirmed, with a proviso that "nothing herein contained shall be construed to confirm any sales or entries of lands * * * upon which there were bona fide pre-emption or homestead claims on the first day of May, 1888, arising or asserted by actual occupation of the land under color of the laws of the United States, and all such pre-emption and homestead claims are hereby confirmed." *Held*, that the words "actual occupation," as used in the statute, mean residence on the land, and that one who had merely gone upon a tract of the land, and had partly constructed a building thereon, prior to May 1, 1888, with the intention of acquiring title under the homestead law, but who did nothing further until in March, 1889, remaining until that time a resident and voter in another township, was not in the actual occupation of the land on May 1st, and his claim was not confirmed by the act, as against one who prior to his taking up his residence on the land, and after the passage of the act, had filed an application to enter the same as a homestead.

**2. SAME—FINDINGS OF FACT BY LAND DEPARTMENT—CONCLUSIVENESS.**

A determination by the Land Department, in a contest between homestead claimants, that one of the parties did not become an actual occupant of the land until a certain date, is one of fact, and conclusive on the courts.

**3. SAME—ABANDONMENT OF CLAIM.**

One claiming homestead rights in a tract of land as a settler thereon, who acquiesced in the decision of the Land Department adverse to his claim, and thereafter filed a new application to enter the same as a homestead as public land, on the ground that a prior entry thereof by another was invalid, must be regarded as having abandoned his original claim, and cannot thereafter maintain a suit based thereon.

**4. SAME—HOMESTEAD SETTLEMENT—LANDS IN UNFORFEITED GRANT.**

Under section 3 of Act May 14, 1880, 21 Stat. 141 [U. S. Comp. St. 1901, p. 1393], giving settlers on public lands, claiming under the homestead laws, the same time to file their homestead applications and to perfect

121 F.—1

their entries as had been previously allowed to settlers under the preemption laws, and providing that their rights should relate back to the time of settlement, no rights can be acquired by settlement on land which is not at the time public land, but the title to which is vested in the state by a prior grant, although such grant is subsequently declared forfeited under power therein reserved.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

By the first section of the act of Congress of March 2, 1889 (25 Stat. 1008), all lands theretofore granted to the state of Michigan by an act of Congress of June 3, 1856 (11 Stat. 17), to aid in the construction of certain railroads in said state, which were opposite to and coterminous with the uncompleted portion of any of such railroads, were forfeited to the United States, and declared to be a part of the public domain. By that act the state of Michigan had been authorized to dispose of said lands in aid of the construction of said railroads only as the work progressed, and it was provided that, if any of them was not completed within 10 years, no further sales should be made, and the lands unsold should revert to the United States. The construction of certain, if not all, of said railroads, was not begun within said prescribed period of 10 years, and at the time of the passage of the Act of March 2, 1889, portions of certain of said railroads were still uncompleted. And it was in the exercise of the right on the part of the United States to resume the title to the then unearned portions of said grant of June 3, 1856, that said act was passed. The necessity of such or other action on the part of the United States to make said forfeiture clause operative was not understood at first. Indeed, until the decision of the Supreme Court of the United States in the case of Schulenberg v. Harriman, 21 Wall. 44, 22 L. Ed. 551, delivered in 1874, as to the effect of a like clause of forfeiture in a like grant to the state of Wisconsin, said clause in the Michigan grant was deemed to be automatic, and upon the termination of the 10 years, ipso facto, to put an end to the grant, and restore the unearned lands to the public domain. In 1866, after the expiration of that period, said lands were put upon the market by the Land Department of the United States, and kept there at least until the rendition of said decision. Sales thereof were made to cash entrymen, and selections were made therefrom in aid of the construction of a canal between Portage Lake and Lake Superior under grants made to the state of Michigan in 1865 to 1866, and possibly under the swamp land act and other acts of Congress. Possibly such dispositions of certain of said unearned lands were made even after 1874, and until the passage of said act of March 2, 1889. Possibly, also, sales of portions of said unearned lands had been made to pre-emption and homestead claimants under the pre-emption and homestead laws after the expiration of said 10 years. It is certain that at the time of the passage of said act there were, and for some time prior thereto had been, persons who were looking to the ultimate acquisition of the title to certain of said lands under said laws, some of whom were in the actual occupancy of the lands hoped to be acquired by them. Neither said cash purchasers, nor the holders of said selections, nor the persons expecting to acquire title under the pre-emption or homestead laws, had any interest whatever, legal or equitable, in the lands covered by their respective claims, because of the fact that the legal title thereto was outstanding in the state of Michigan at the time of the transpirance of the things upon which said claims could be based. But Congress recognized that certain of said claimants were entitled to consideration at its hands, and, in view of this, provided by the third section of said act of March, 1889, as follows, to wit:

"That in all cases when any of the lands forfeited by the first section of this act or when any lands relinquished to or for any cause resumed by the United States from grants heretofore made to the state of Michigan, have heretofore been disposed of by the proper officers of the United States or under state selections in Michigan, confirmed by the Secretary of the Interior, under color of the public land laws, where the consideration received therefor

is still retained by the government, the right and title of all persons holding or claiming under such disposals shall be and is hereby confirmed: provided, however, that where the original cash purchasers are the present owners this act shall be operative to confirm the title only of such cash purchasers as the Secretary of the Interior shall be satisfied have purchased without fraud and in the belief that they were thereby obtaining valid title from the United States; that nothing herein contained shall be construed to confirm any sales or entries of lands or any tracts in any such state selections upon which there were bona fide pre-emption or homestead claims on the first day of May, 1888, arising or asserted by actual occupation of the land under color of the laws of the United States, and all such pre-emption and homestead claims are hereby confirmed."

Amongst the railroads in aid of the construction of which said grant of June 3, 1856, was made was one from Marquette to Ontonagon; and at the time of the passage of the act of March 2, 1889, a portion, if not all, of said railroad was uncompleted. On the 24th of January, 1888, the appellant, James P. Edwards, at the time and many years prior thereto a citizen and resident of Houghton, Mich., went upon the S. W. ¼ of section 19. township 50 north, range 35 west, Houghton county, Mich.—a part of the unearned lands granted June 3, 1856, to the state of Michigan in aid of the construction of the said railroad from Marquette to Ontonagon—to build a house thereon. He remained a couple of days, built a foundation, and cut some logs for the house, and then left. February 6, 1888, he made application at the land office at Marquette, Mich., to enter said quarter section of land under the homestead laws of the United States, and his application was rejected upon the ground that it was within the limits of said railroad grant. April 4, 1888, appellant returned to the land, and remained eight or ten days, in which time he erected the walls of the house about eight feet high, and then went away. It was his intention at that time to complete the house and make a clearing, but he was prevented by rheumatism. In July, 1888, he was on the land again for a couple of hours, to see in what shape things were, and was not there any more until March 13, 1889. Up until at least March 9, 1889, he remained a citizen and resident of Houghton. He was a trustee of the village during the entire year of 1888, and until March 9, 1889, when he resigned, and he voted there in the fall of 1888. On March 13, 1889, he went upon the land in question again, and remained there until April 30th. During that time he completed the house and made a clearing, and on the 1st of April he voted at Laird, the township in which the land was located. Notice had been given by the Land Department that on May 1, 1889, applications to enter lands forfeited by the act of March 2, 1889, would be received, and on that date appellant filed a homestead application for said quarter section of land at Marquette. May 14, 1889, he returned to the land with his family, planted some vegetables, and remained there until in October, 1889, when his family left the land finally. Appellant for two or three years afterwards was on the land for a good part of the summer of each year and portions of the winter.

On March 6, 1889, one Jesse Ford, filed a homestead application for said land, which he renewed May 1, 1889. On March 7, 1889, one Mollie O'Connor went on the land and cut some brush. She also cut four poles, which she arranged in the shape of a foundation for a house, and employed men to build her one. They completed it by March 30th, and thereupon she established her residence there, which she continued to maintain for several years afterwards. On May 1st she, too, filed a homestead application for said land.

The pendency of these three separate applications to enter this land under the homestead law brought on a contest amongst the applicants in the Land Department to determine which had the better right to the land, and it was carried from the register and receiver at Marquette, through the Commissioner, to the Secretary of the Interior, who decided it on June 18, 1894. The register and receiver decided the contest in favor of appellant, the Commissioner in favor of Mollie O'Connor, and the Secretary of the Interior in favor of Jesse Ford. The ground of the latter's decision was that the lands forfeited by the act of March 2, 1889, were open to entry from that date. when it became a law. Ford's claim to the land dated from March 6, 1889, when he made his application to enter it. Mollie O'Connor's claim could not date

prior to March 7th, the day after Ford's application to enter; and really her act of settlement did not begin until after March 13th, when appellant was on the land. Appellant's claim could not be placed earlier than March 13th, because "until March 9th he remained a legal resident of Houghton, * * * and did not become both a legal and actual resident on the land until March 13, 1889."

Motion for a review of the decision of the Secretary of the Interior was made, which was overruled, and the case was closed January 21, 1895. March 6, 1895, Ford made homestead entry for the land. On July 6, 1895, he relinquished that entry, and on same day one William A. Cornelius made homestead entry for the W. ½ and S. E. ¼ of said quarter section of land, and George H. Berry made homestead entry for the N. E. ¼ thereof. These entries were made under the law providing for soldier's additional homestead.

Thereafter, on October 24, 1895, appellant filed at Marquette an original application to make homestead entry for that portion of said quarter section included within the entry theretofore made by Cornelius, in accordance with the requirements of section 5 of the act of Congress of March 3, 1891, 26 Stat. 1096 [U. S. Comp. St. 1901, p. 1550], relating to pre-emption and homestead entries. It was rejected by the register and receiver upon the ground that the lands sought to be so entered were not public lands, as they had been segregated therefrom by the entry of Cornelius. The case made by this application of the appellant was carried by him on appeal through the Commissioner to the Secretary of the Interior, and each officer affirmed the decision of the register and receiver. It was closed May 3, 1897. The ground upon which appellant claimed that said land was a part of the public domain, and subject to entry on his part, was that Cornelius had, prior to the making of the entry in question, made an entry in Minnesota under the soldier's additional homestead law, and was not entitled, therefore, to make another entry thereunder. It appeared, and was so held by said officers of the Land Department, that the Minnesota entry in Cornelius' name was fraudulent, not having been made by him or by his authority, and it was therefore canceled. Having thus failed to get his said application granted, on May 1, 1897, appellant began an attack on said entry made by the said Cornelius July 6, 1895, upon the ground that it had been made for the use and benefit of said Jesse Ford, and, further, that it had not in fact been made by said Cornelius. This attack was carried through the various officers by appeal to the Secretary of the Interior, and it was decided by all of them that it was not warranted, because Cornelius had a right to make the entry for the use and benefit of the said Ford, and he had in fact made it. This case was closed May 23, 1897.

On May 3, 1898, appellant filed a petition before the register and receiver for the issuance of patent to him for said quarter section of land upon the ground that on the 1st day of May, 1888, he was in the actual occupation of the said land in good faith, claiming the same under and by virtue of the homestead laws, and that therefore his said claim was confirmed and validated by said section 3 of the act of March 2, 1889. This petition was forwarded to the Commissioner, who denied it on August 20, 1898. October 14, 1898, appellant appealed from the decision to the Secretary of the Interior, and pending this appeal this suit was brought.

Before proceeding to state the nature thereof, and the relief sought, it is necessary to go back a little, and narrate some further action in relation to said land. After said Cornelius and Berry had made their respective entries, on July 6, 1895, and on the same day, they each executed and delivered warranty deeds to said Ford for the lands embraced by their said entries. Thereafter and on the same day said Ford executed and delivered a mortgage on said land to L. C. Black to secure a note given by him to said Black for the sum of $1,600. April 15, 1896, a patent was duly issued for the land embraced in his entry to said Berry; there being no opposition thereto. November 12, 1897, said Ford conveyed and warranted said quarter section of land to one Lydia A. Mapes, subject to said mortgage to Black. January 29, 1898, said Black assigned and transferred said note and mortgage to the appellee, Frederick H. Begole. And on August 27, 1898, a week after the denial by the Commissioner of appellant's petition, a patent duly issued to said Cornelius for the portion of said quarter section of land embraced in his entry.

This suit was brought by the appellant against said Lydia A. Mapes, the holder of the legal title to said land, and the appellee, Frederick H. Begole. Other persons connected with the timber on said land were also made defendants, but it is not necessary to state the nature of their relation thereto. The object of the suit was to have it adjudged and decreed that the said Lydia A. Mapes held the legal title to said land in trust for the appellant, free from appellee's mortgage, and to compel a conveyance thereof to him, and a relinquishment of said mortgage, because of a prior equitable right to said land in the appellant. The ground upon which it was claimed that he had this prior right was the same as that set forth in his petition filed in the land office on May 3, 1898, as a reason why a patent should be issued to him for said land, to wit, that "on the 1st day of May, A. D. 1888, he was in the actual occupation of said land in good faith, claiming said land under and by virtue of the homestead laws of the United States, within contemplation of section 3 of the act of March 2, 1889"; that by said section thereof "the claims of all persons who in good faith on May 1, 1888, were in the actual occupation of any portion of the lands forfeited by said act, claiming same under color of the homestead or pre-emption laws, were confirmed, where such claims were being asserted by such occupation"; and that therefore his "claim was thereby confirmed." This was the sole equitable claim to the land which the appellant alleged in his bill as a basis for the relief sought by him. He set forth the proceedings in the Land Department which resulted in the decision that the said Ford had the prior equitable claim. He also set forth his petition to said department for the issuance to him of a patent for said land, and alleged that, by fraud of an attorney and two clerks in the department, said patents were issued to said Berry and Cornelius before said petition was finally disposed of, and the jurisdiction to consider further said petition was ousted. No reference was made in the bill to his application to make an entry of date October 24, 1895, or to his attack on the entry of Cornelius. A default decree was entered, and thereafter, upon petition of the appellee, Begole, that decree was set aside, and he permitted to defend the suit. Upon final hearing the lower court dismissed the appellant's bill.

Rush Culver, for appellant.

A. B. Eldredge and A. E. Miller (L. C. Black, of counsel), for appellee.

Before DAY, Circuit Judge, and THOMPSON and COCHRAN, District Judges.

COCHRAN, District Judge, after stating the foregoing facts, delivered the opinion of the court.

It seems to us clear that the appellant was not entitled to the relief sought, and that therefore the decision of the lower court was right. Counsel for appellee contend that section 3 of the act of March 2, 1889 (25 Stat. 1008), confirms pre-emption or homestead claims of the character therein described, in so far as they conflict with the claims of cash purchasers and those claiming under state selections, and no further, and that, inasmuch as it did not appear by allegation or proof that there was any claim to the land involved herein by a cash purchaser or under a state selection, appellant's claim was not within said section 3, or confirmed by it. In support of the first part of their contention, they cite the following extract from the opinion of Mr. Justice Brewer in the case of Lake Superior Ship R. & I. Canal Co. v. Cunningham, 155 U. S. 354, 15 Sup. Ct. 103, 39 L. Ed. 183, in which there was a contest between said canal company, claiming under a state selection, and a homestead claimant, in regard to a quarter section of land forfeited by said act of March 2, 1889, to wit:

"Congress knew that these lands, the title of which it was purposed to resume, discharged of all right on the part of the state of Michigan to use them in aid of the construction of a railroad, were already subject to other and conflicting claims, of no legal validity, yet of a character justifying consideration. Under those circumstances, with the view of securing an equitable adjustment of these conflicting claims, it enacted the second and third sections of this act."

They cite also this further extract therefrom, in which he considers the closing sentence of said section, to wit:

"Evidently the intent of Congress was that, in all cases of a conflict between a selection in aid of the canal grant and the claim of any settler, the confirmation should depend upon the state of things existing at a named date, to wit, May 1, 1888; that date being about ten months prior to the passage of the act. If at that time there were no bona fide pre-emption or homestead claims upon any particular tract, the title of the canal company was confirmed. If, on the other hand, there was then a bona fide pre-emption or homestead claim, arising or asserted by actual occupation of the land under color of the laws of the United States, such pre-emption or homestead claim was to have preference, and was confirmed. It was the purpose not to leave open to dispute between the parties any question as to the relative equities of their claims, but to fix a precise time, and to describe with particularity the conditions which must exist at that time in order to give the one priority over the other."

It is undoubtedly true that the main, if not only, object and purpose of section 3, was the fixing of priority between such conflicting claims. Indeed, it appears from the debates in Congress, and the section itself shows the motive for said section was the confirmation of the claims of cash purchasers and those claiming under the state selections; but as it was conceded upon all hands that the pre-emption and homestead claims of the character therein described were more meritorious than said other claims, even though coming into existence later, it was provided that there should be no confirmation of said other claims as against said pre-emption and homestead claims. And if the last clause of the section, to wit, "and all such pre-emption and homestead claims are hereby confirmed," which seems to have been added to the section as originally drawn, had not been so added, there would have been nothing in the section expressly confirming said pre-emption and homestead claims as against the United States. But the effect of said clause was so to confirm them. Mr. Justice Brewer, in said case, in referring further to said closing sentence, said:

"The claim of any settler coming within the scope of this clause was declared by it prior to the claim of the canal company, and was also, as against the United States, confirmed."

It is to be considered, therefore, whether Congress did not intend by said last clause to confirm all pre-emption and homestead claims of the character described in said closing sentence, where there were no such conflicting claims, as well as where there were. It may be urged that if pre-emption and homestead claims of that character were deemed to be so meritorious that they were confirmed all around, even where they came into existence subsequent to such conflicting claims, no reason can be assigned why Congress would not desire to confirm them as against the United States alone, where there was

no conflict, and that by the word "such," in said last clause, it meant simply pre-emption and homestead claims of the character described in said closing sentence, and no more. And so far as said extracts from the opinion of Judge Brewer, relied on, are concerned, it may be said that they go to the extent of saying that the section confirms pre-emption and homestead claims of the character described, where there is a conflict, and not of saying that it does not confirm them where there is no conflict; that question not being involved in the case.

But we do not find it necessary to dispose of this question herein. Conceding that pre-emption and homestead claims of the character therein described are confirmed by said section in all cases, appellant was not entitled to the relief he sought. That section does not confirm all pre-emption and homestead claims, but only pre-emption and homestead claims of a certain character. They must be "bona fide," and "arising or asserted by actual occupation of the land under color of the laws of the United States." Mr. Justice Brewer, in the case already referred to, directed attention to both these characteristics. Concerning the latter, he said:

"While the term 'homestead claim' is sometimes used to denote the more formal application at the local land office, obviously this is not the purport of the term as used in this section, for it is defined by the succeeding words, 'arising or asserted by actual occupation of the land.' This obviously includes cases in which the party is on the 1st of May, 1888, in the actual occupation of the land, with a view of making a homestead on it under the laws of the United States."

Concerning the former, he said:

"If a party entering upon a tract, although he knew that it was within the limits of an old railroad grant, did so under the honest belief and expectation that that grant, if not technically extinguished by lapse of time, had remained so long unappropriated by any beneficiary that Congress would shortly resume it, and in that belief determined to make for himself a home thereon, with a view of perfecting his title under the land laws of the United States when the forfeiture should be finally declared, it must be held, we think, that he is, within the terms of the confirmatory act, a bona fide claimant of a homestead."

No doubt, appellant came within this required characteristic, but he did not come within the other. His claim did not arise, nor was it asserted, by actual occupation of the land. He did not become an actual occupant of the land prior to March 13, 1889. In 21 A. & E. Enc. of Law (2d Ed.) p. 768, it is said that:

"Occupancy may consist of cultivation and use, without actual residence, or may be by tenant. The term, however, as used in some relations, may import actual residence."

We think the words "actual occupation," as here used, mean residence. In this sense of the word, it is clear that appellant was not an actual occupant of the land involved herein before March 13, 1899. He was on it prior thereto three times in the year 1888—the latter part of January, the early part of April, and in July. At the first time he was there about two days, and built a foundation and cut some logs for a house; the next time he was there eight or ten days, and partially completed the house; and the last time he spent

a couple of hours there, seeing how things were. During all this time his residence and domicile were at Houghton. He was a trustee of the village and voted there in the fall of 1888. Before he became a resident upon the land, to wit, on March 6, 1889, Ford's claim had attached thereto by his homestead entry of that date, and appellant could not thereafter acquire, by anything he did, any right in or to the land as against Ford.

Besides this, it was a question of fact whether or not he was an actual occupant of the land on May 1, 1888, and in the contest between him and Jesse Ford and Mollie O'Connor, before the Land Department, as to who had the prior claim to the land, it had jurisdiction, in disposing of that contest, to determine this question of fact. This it did adversely to appellant's contention, and its determination thereof is final. In the recent case of American School of Magnetic Healing v. McAnnulty (decided by the Supreme Court of the United States on November 17, 1902) 23 Sup. Ct. 33, 47 L. Ed. ——, Mr. Justice Peckham said:

"The Land Department of the United States is administrative in its character, and it has been frequently held by this court that, in the administration of the public land system of the United States, questions of fact are for the consideration and judgment of the Land Department, and its judgment thereon is final. Burfenning v. Chicago, St. P., M. & O. R. Co., 163 U. S. 321 [16 Sup. Ct. 1018, 41 L. Ed. 175]; Johnson v. Drew, 171 U. S. 93, 99 [18 Sup. Ct. 800, 43 L. Ed. 88]; Gardner v. Bonestell, 180 U. S. 362 [21 Sup. Ct. 399, 45 L. Ed. 574]."

It will be seen, therefore, that the effect of this decision was to finally dispose of all claim on appellant's part under said act of March 2, 1889, and that he could not thereafter successfully maintain same either before the Land Department or in the courts. And even if it did not have that effect, and he thereafter had the right to assert his said claim and to have its validity passed on in either forum, there is room, at least, for maintaining that by his conduct subsequent to the rendition of that decision he abandoned same, and by reason thereof lost any rights he may theretofore have had by reason thereof. He acquiesced in said decision, and on October 24, 1895, filed an original application under the homestead laws to enter the three-fourths of the land covered by the soldiers' additional entry made by Cornelius on July 6, 1895. This he did upon the basis of the claim that Cornelius' right to make same had been exhausted by a prior entry, and that portion of said land was therefore public land, and subject to homestead entry. He filed no such application to the one-fourth thereof covered by Berry's entry, no doubt because said entry was considered to be valid, and patent was permitted to issue to him on the 15th day of April, 1896, without objection on his part. After this application was finally rejected, and the case was closed, on May 3, 1897, he made the attack upon the entry of Cornelius on the grounds hereinbefore stated, with the view, no doubt, of throwing the land covered by it open to entry again. It was not until a year after this attack was disposed of adversely to his contention, and after appellee had in good faith acquired the note and mortgage in question herein for value, and without other notice of appellant's

claim than the records afforded, to wit, on May 3, 1898, that he filed his petition for issuance of a patent, which relief he sought upon the ground that his original homestead claim had been confirmed, and he had thereby acquired title to the land "out and out" by the act of March 2, 1889. That his said claim was the subject of abandonment is clear. Even if his claim was within the confirmatory provision of said act, the effect of said confirmation was not so thoroughgoing as claimed by appellant in his said petition. This court so held in the case of Cunningham v. Metropolitan Lumber Co., 49 C. C. A. 72, 110 Fed. 332. Judge Clark, in delivering the opinion of the court, said:

"The contention of plaintiffs in error is that the proviso to the act of Congress of March 2, 1889, confirming the rights of homestead claimants, as construed by the Supreme Court of the United States in Iron Co. v. Cunningham, 155 U. S. 354, 15 Sup. Ct. 103, 39 L. Ed. 183, had the effect to change the inchoate homestead claim recognized by the act into an absolute title, so that thereafter homestead claimants in the situation of Cunningham stood clothed with full title, without the necessity of the payment of any sum to the United States, or otherwise complying with such regulations and conditions as would have been required by law in the absence of the confirmatory grant contained in this act of Congress. * * * In this view we are unable to concur. Such a construction of the act would not be just to the United States, and it was certainly more than justice to a homestead claimant in Cunningham's situation required. It was the intention of Congress to recognize such equitable considerations as existed in favor of those who had undertaken in good faith to acquire a homestead, and to comply with the general law and regulations of the land office in relation to such a claim, and to enable them to go forward in the ordinary way and perfect their right by compliance with the law."

The conclusion is therefore irresistible that appellant has no equitable right to the land by virtue of the confirmatory provision of the act of March 2, 1889. He did not come within that provision, as the facts proven herein show, and the decision of the Land Department held. And if he did, there is room at least for holding that he abandoned his claim thereunder.

But appellant does not rest his claim to said land alone upon said confirmatory provision. He urges here, and there is ground for believing that he so urged in the lower court at the hearing therein, that he has an equitable right to the land, as against the legal title and appellee's mortgage claim, by virtue of section 3 of the act of May 14, 1880, 21 Stat. 141 [U. S. Comp. St. 1901, p. 1393], which is in these words:

"That any settler, who has settled or who shall hereafter settle, on any public lands of the United States, whether surveyed or unsurveyed, with the intention of claiming same under the homestead laws, shall be allowed the same time to file his homestead application and perfect his original entry in the United States land office, as is now allowed to settlers under the pre-emption laws to put their claims on record, and his rights shall relate back to the date of settlement, the same as if he settled under the pre-emption laws."

He claims that though what he did prior to Ford's entry on March 6, 1889, was not an actual occupation of the land, within the act of March 2, 1889, it was a settlement, within the meaning of said section of the act of March 14, 1880, and of the public land laws of the United States, and therefore his claim and application to enter

under the homestead laws of May 1, 1889, took precedence to said Ford's entry; and that, if this position is not well taken, what he did after March 13, 1889, amounted to such a settlement, and upon the relinquishment of Ford on July 6, 1895, his claim by virtue thereof attached at once, and same, followed up by his homestead entry on October 24, 1895, took precedence of the entries of Berry and Cornelius on July 6, 1895.

To this it may be answered that at no time was such a contention set up in the long litigation pending in the Land Department. The contention at first was that appellant was entitled ·to the land under the confirmatory provision of the act of March 2, 1889, and afterwards under the homestead laws, because of his original application and the invalidity of Cornelius' entry. Besides, no such contention is set up in the bill in this suit. Appellant's case herein is founded upon no such theory. It is based solely upon said confirmatory provision of the act of March 2, 1889, and he ought not, therefore, to be allowed to recover on any other theory. But the contention is without merit otherwise. Assuming that what appellant did on the land in 1888 amounted to a settlement if same had been open to settlement, at that time it was not so open. It was not public land. The title thereto was in the state of Michigan. After March 2, 1889, when same was restored to the public domain, and before Ford's entry of March 6th, he did nothing on the land which amounted to a settlement. Likewise, assuming that what appellant did on the land after March 13, 1889, amounted to a settlement if same were open to a settlement, it was not so open, because of Ford's prior entry. At the time of Ford's relinquishment, appellant was not then residing on the land, having given up his residence thereon several years prior thereto; and he did nothing in the way of a settlement after said relinquishment, and before the entry of Berry & Cornelius. The settler upon whom section 3 of the act of May 14, 1880, confers any rights, is a settler "on any of the public land of the United States," and at no time whilst the land in question was public land of the United States did appellant settle thereon, or perform any act amounting to a settlement. That it is only in such cases that said section applies was recognized by the Supreme Court in the recent case of Nelson v. The Northern Pac. Ry. Co. (decided Jan. 26, 1903) 23 Sup. Ct. 302, 47 L. Ed. ——; a case in which said section was applied. Mr. Justice Harlan, in delivering the opinion of the court, said:

"The third section of this statute is a distinct confirmation of the rights of a qualified person who had theretofore settled or should thereafter settle on any of the public lands of the United States, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, though, of course, no lands could be deemed of that character which had prior to such settlement become vested in a railroad company in virtue of an accepted map of definite location."

And again he said:

"Nelson's occupancy occurred after the passage of the act of 1880. While that act did not apply to a railroad company which had acquired the legal title by a definite location of its road, it distinctly recognized the rights prior to such time to settle upon the public lands, whether surveyed or unsurveyed,

with the intention of claiming same under the homestead laws. In occupying the land here in dispute, Nelson did not infringe upon any vested right of the railroad company; for there had not been at the date of such occupancy, in 1881, any definite location of the line of the railroad, and the land so occupied, with other lands embraced by the map of general route, constituted only a 'float'; the company having, at most, only an inchoate interest in them—a right to acquire them if at the time of definite location it was not occupied by homestead settlers, 'nor incumbered with other claims or rights.'"

The judgment appealed from is affirmed.

DAY, Circuit Judge, participated in the decision of this case.