Howry, J.,
delivered the opinion of the court:
Two questions, one of fact and one of law, are raised in this case.
The issue of fact relates to loyalty to the United States, from the beginning to the close of the civil war, of William Hunt (now deceased), who, at the time of the Mississippi ordinance of secession, was engaged in the business of planting in Washington County in that State. Mr. Hunt was born and educated in Massachusetts, but removed to Kentucky and established a home at Frankfort. Subsequently he acquired the ownership of valuable land in the vicinity of Greenville, Miss., and was engaged in planting at the outbreak of the war. He seems to have maintained until in 1861 his two homes, but acquired a voting residence in Mississippi until the results of the secession of the State drove him away. He voted against the candidate who advocated the secession of the State and had the reputation not only of being loyal to the United States, but violently hostile to the cause in opposition. He frequently declared himself against the southern cause, and informed his slaves that it would be better for them to stay at home and take care of their families and the property on his plantation, inasmuch as they would all be free in any event.
*570 Soon, after the commencement of hostilities Mr. Hunt took his departure for Kentucky, and made his residence there with his family. He .occasionally returned to look after his property and the colored people on the premises. When he did so he came down the river on vessels in the control of the United States and procured rations for the use of his slaves. He was never at any time charged with disloyalty to the United States, but mingled freely with the military forces of the Government, and was never subjected to arrest or restraint by the authorities operating for the General Government. Very early in 1862 he was reported as disloyal to the confederate authorities, and, acting on that information, Gen. Samuel W. Ferguson, then in command of the confederate cavalry and pickets around Vicksburg, sent a communication to Gen. Earl Van Dorn, then in command of the confederate forces in that city, charging Hunt with disloyalty to the reigning local government. Thereupon a written order was issued by General Van Dorn for the arrest of Mr. Hunt on the charge of disloyalty to the confederate government, with instructions to have him sent under guard to Vicksburg. The specific charge, in addition to the general charge of disloyalty, was that Mr. Hunt was in communication with the military forces of the United States and was obtaining supplies through their lines for the use of the colored people upon his plantation. For a time Mr. Hunt evaded arrest, but was subsequently captured by Col. Wirt Adams.
The record does not show anything further on this point. It does show that Mr. Hunt strenuously objected to one of his son’s organizing a company for the confederate army and that he endeavored to send another son to Germany rather than see him enter the military service of the South. The correspondence of Mr. Hunt with his family during the entire period of the war is full of expressions of loyalty to the cause of the Union. This correspondence, contemporaneous with the stirring events of those days, discloses the earnest conviction of Mr. Hunt that the war could have but one ending, and that secession was not only a mistake but wrong. As a part of the res gestae, the letters written by *571 him are significant in that they establish his sympathies wholly to have been upon the side of the United States, and that he was as loyal to his Government as any man well could be not actually engaged in its military service. It preponderates so greatly we are constrained to hold that Mr. Hunt was loyal.
But it is contended that the court can not now make a finding of loyalty because, under the act of March 3, 1883, commonly known as the Bowman Act (22 Stats., 485), Mr. Hunt was found not loyal, and that on this issue the matter is res judicata.
It seems that the former finding was predicated largely upon the presumption of a continued legal residence where Mr. Hunt’s planting interests lay and that certain of his slaves were removed, presumably upon his order, to Texas. It will thus be seen that the issue was largely determined by those presumptions arising out of supposed residence and the alleged affirmative act of an endeavor on the part of the owner to escape the consequences of the presence of certain of his slave property within the territory coming into the possession of the United States forces.
But the court has reviewed the entire record, including the testimony taken under a different statute as well as under the present reference, and we have carefully considered the issue-in the light of those decisions which hold that by a reference under the Tucker Act all the facts may be considered and a new finding reported where there were such mistakes in the former judicial proceeding which, if known to the court at the time, would have affected its judgment. (White v. United States, 33 C. Cls. R., 368; Rymarkiewicz v. United States, 42 ib., 1; Le More v. United States, 39 ib., 484; Chieves v. United States, 42 ib., 21.)
In Markham’s case (44 C. Cls. R., 519) William Markham claimed under the captured and abandoned property act and recovered a judgment very soon after the close of the civil war on a finding of loyalty in conformity with that act, and the judgment was paid. Subsequently, and after the death of Markham, another claim by his heirs was filed in this court for rental and use of certain buildings,-occupied by *572 the military forces of the Government, owned by Markham in Atlanta, Ga. It was contended, upon the second reference, by the defendants that the former decision of this court in the claim under the captured and abandoned property act could not be invoked in favor of the finding of loyalty then made. It was held to have been Markham’s duty to have disclosed certain facts which would have, if known, operated to result in a finding of disloyalty. At the time, however, Markham could not testify, but the view of the court was that it became his duty to have communicated that state of affairs which, had the court obtained knowledge of it, would have resulted in a judgment in favor of the Government. Accordingly, on the last reference Markham was found not loyal, and the case was so reported to Congress.
This case is not exactly like that of Markham, but is sufficiently governed by the principle which authorizes the correction of mistake in the former action of the court.
It appears that Mr. Hunt died soon after the war. He could not, in the then state of the law, testify to sustain his contention of loyalty. But the evidence presented shows that Mr. Hunt’s legal place of residence began where a different presumption prevailed than that which attached had he remained on his plantation. When he abandoned his plantation and with his family went northward to an established residence in Kentucky he was certainly loyal. That presumption continued until overcbme by evidence to the contrary, because of the rule that the inhabitants of a State adhering to the cause of the Union were presumed, in the absence of proof, to have been loyal. Had Mr. Hunt remained South, the presumption of disloyalty throughout the war would have been applied until overcome by positive testimony. It is established under the present reference that when the case was heard under a different act the party in question was a nonresident of the seceding State and that the removal of some of the Hunt property, for greater confederate protection, was not chargeable to the owner, but, upon the contrary, Mr. Hunt did everything in his power to secure the return of certain of the slaves whence they were taken.
Believing that injustice has been done to the memory of a *573 loyal man, that Mr. Hunt was not connected with the only disloyal act charged against him (which the court accepted under another act), and that he continued to cherish the same sentiments in Kentucky that caused his removal from Mississippi, and that an erroneous presumption was applied as the result of misinformation and mistake, the court is of opinion that the finding of loyalty, with the reasons therefor, should be certified.
The fourteenth section of the act of March 3, 1887, commonly known as the Tucker Act (24 Stats., 505), under which the present action is taken, provides for the investigation of claims on the Government for which there is no remedy; and the court is directed uto report the facts ” to Congress. There are no words of limitation restricting the jurisdiction in such cases. If there were, the court could not find the facts so that Congress could apply the remedy which they might desire to apply.
Difficult as it may be for the-defendants to obtain evidence, the court can not for that reason refuse to carry out the will of Congress, but must administer the law, no matter how troublesome the task, in the effort to prevent fraud or imposition. But in this connection we may as well state here that where a former finding is properly presented for subsequent examination the case as made by either party must be strong indeed for the court to correct previous action.
Findings under the act of March 3, 1883, supra, are advisory, and until Congress shall make use of them by way of appropriation in payment of a matter reported there is no vested right acquired by the party in whose favor it is made. (Widmayer & Bates, 42 C. Cls. R., 519; Guttormsen v. United States, 43 Ibid., 305.) Hence a mere report is not “ an adjudicationThe law must confer that kind of jurisdiction. (White River Utes v. United States, 43 Ibid., 265.)
Where the proceeding is ancillary and unacted on by the body receiving the report there is nothing binding on either party. This view is in line strictly with numerous authorities which hold that where an opinion only is expressed by any kind of an inferior tribunal which may or may not be carried into effect at the pleasure of Congress such opinion *574 binds no one, and such action is no judgment in the legal sense.
It goes without saying that judgments of courts of record having general jurisdiction of the subject, although erroneous, are binding until reversed. But without a judgment the plea of res judicata has no foundation, and neither the verdict of the jury nor the findings of the court, even though in a prior action, upon the precise point involved in a subsequent action and between the same- parties constitute a bar. A thing “ adjudged ” must be the entry of a formal judgment. A verdict or finding of the- court of a fact alone (the basis of the judgment) is not sufficient. The reason is, the judgment itself is the bar and not the preliminary “ determination ” of the court or jury. (Oklahoma City v. McMaster, 196 U. S., 533.)
In the Oklahoma City case evidence of a former adjudication was introduced to sustain the contention of the plaintiff that a judgment in his favor for the recovery of the land in dispute had been rendered by a territorial court. Plaintiff argued that in the second case defendant was bound as a privy by the “ adjudication ” in the former action. The paper was received in evidence by the lower court. Commenting on this condition of affairs the Supreme Court declared that the paper offered in evidence to sustain the plea of res judicata was “ nothing but a finding of facts by the judge trying the cause.” Another paper was offered and received in evidence in the lower court signed by the trial judge which directed the defendant to make, execute, and deliver to the plaintiff a conveyance as previously decreed by the court. The attempt was made, said the Supreme Court, to piece these two documents together, the finding of facts and the order of the court, so that the whole should be considered as a judgment. Commenting on this state of affairs Mr. Justice Peckham said that there was no judgment and the finding of facts should not have been held to be such and “ for the error in the admission of the so-called judgment,” the court said “ the case must be reversed.”
Congressional cases transmitted under the Bowman Act involve no legal question for the court to determine, and do *575 not necessarily rest upon a legal right. The means taken to make such findings are judicial as to procedure merely. (Osborne’s case, 24 C. Cls. R., 416.) Until Congress acts, reports in such cases (where no judgment is entered) are in abeyance, and may be reviewed where the same matter is transmitted under the Tucker Act. This practice has been followed in cases properly presented (and there have been occasional cases) since White’s case (33 C. Cls. R., 368) and the practice, based upon the effort of the court to do justice where the way is open, is settled.
It should be stated, however, as was remarked in the Ry-marldewicz case, “ that the rule of res judicata is not alone applicable to what are generally considered by the profession as judgments, but judgments in the broader sense of the word, as embracing determinations and conclusions of other bodies than courts when the matter is solely within their jurisdiction.” (42 C. Cls. R., 1, 4.) For example, the rule has been applied to the decisions of courts-martial. (Swain v. United States, 165 U. S., 533; Weirman v. United States, 36 C. Cls. R., 236; awards of arbitrators, 3 Cyc., 728, and cases cited; the rulings of the General Land Office; Johnson v. Drew, 171 U. S., 93; Stewart v. McHarry, 159 U. S., 643.)
It will be readily seen that these cases have no application here, because the true test in the application of the rule is whether the decisions are final, which can not be the case in a court unless final judgment has been entered.
It may be well to remark, however, that the reason for the rule has much application in the findings of this court in references under the Bowman and Tucker acts, and we will always be much loath to change findings once made upon a rereference, particularly if that is asked upon evidence based upon the memory of witnesses.
The findings of the court, together with a copy of this opinion, will be transmitted to Congress.