WISCONSIN STATE ASSEMBLY Legislature
By Assembly Resolution No. 25 my opinion has been requested on a series of questions regarding ownership and transfer of mineral rights by railroads. The first question is:
 (1) Is a railroad corporation authorized to own mineral rights to property which is not necessary for the operation of the railroad under section 190.02 (3) and other relevant sections of the statutes and Case v. Kelly, 133 U.S. 21 (1889), Waldo v. Chicago, St. Paul Fond du Lac Railroad, 14 Wis. 625 (1861) and other relevant cases?
The answer to this question is no.
The statutes referred to in the question pertain to the acquisition of lands, not ownership. This distinction is important in answering the question, for mineral rights constitute but one interest in the bundle of rights which make up the fee interest in real estate.
There is no statutory authority that I am aware of that specifically authorizes railroads to own mineral rights in Wisconsin. But this does *Page 205 
not mean that a railroad corporation can never be the legal owner of mineral rights in land which is acquired for legitimate railroad purposes. If a railroad corporation acquires land for legitimate purposes as authorized by law, it becomes the lawful owner of any mineral rights in that land as an incident of the ownership of the fee. The legitimate purposes authorized by law are specified in ch. 190, Stats. But a railroad corporation cannot acquire land for purposes not authorized by law. The acquisition by a railroad corporation of mineral rights to property which is not necessary for the operation of the railroad is not authorized by law. Thus, a railroad corporation, in my opinion, may not acquire lands in this state for the purpose of mining or mineral speculation under ch. 190, Stats.
It becomes apparent that the answer as a general proposition is not at all complicated. However, if the answer is to be given in respect to a particular parcel, it becomes complex, for it requires a factual determination as to why the land was acquired and whether such purpose was authorized by law when the acquisition was made.
Section 190.02, Stats.
Particular subsections under sec. 190.02, Stats., expressly set forth the purposes for which railroads may acquire real estate. For example, under subsec. (3), railroads may acquire property necessary for the construction and operation of the railroad, including lands for depots, stations, yards and so forth. Under subsec. (4), lands may be acquired for purposes of cuts, embankments, gravel, etc., as may be necessary for the proper construction and security of the road.
Why would the Legislature specifically list railroad powers in regard to land acquisition unless it meant to limit the railroad corporation to those circumstances enumerated? The fact that the Legislature went to such great lengths in specifically describing the purposes for which railroads could acquire lands strongly suggests the applicability of the principle of statutory construction expressio unius est exclusio alterius. Appleton v.ILHR Department, 67 Wis.2d 162, 226 N.W.2d 497 (1975). But this principle of statutory construction is not necessarily dispositive in the resolution of a statutory inquisition. It was held in Columbia Hospital Asso. v. Milwaukee, 35 Wis.2d 660,669, 151 N.W.2d 750 (1967), that this rule of statutory construction: *Page 206 
 [I] s not a "Procrustean standard to which all statutory language must be made to conform." State ex rel. West Allis v. Milwaukee Light, Heat Tractor Co. (1917), 166 Wis. 178, 182, 164 N.W. 837, 839, quoting Black on the Interpretation of Laws (2d ed.), 219. Factually, there should be some evidence the legislature intended its application lest it prevail as a rule of construction despite the reason for and the spirit of the enactment.
Accordingly, is there some evidence to indicate that the Legislature, when it enacted the predecessor to sec. 190.02, Stats. (ch. 119, Laws of 1872), intended that railroad corporations could acquire lands only for those purposes specifically set forth in the statute and no other?
Prior to 1872, railroad corporations were incorporated by private acts of the Legislature. For example, the Legislature incorporated the Winnebago and Lake Superior Railroad Company by enacting ch. 314, Private and Local Laws of 1866. Chapter 314 was replete with purposes for which railroads could acquire lands, even specifying woodland could be acquired for the purpose of fencing and operations (ch. 314, sec. 1, Laws of 1866). In discussing a similar act, the Court in Case v. Kelly, 133 U.S. 21,26 (1889), noted: "This enumeration of the purposes for which the corporation could acquire title to real estate must necessarily be held exclusive of all other purposes."
This act was not unique in expressly limiting the purposes for which railroads could acquire and hold lands. Other such provisions may be seen in almost every Wisconsin railroad charter granted by the Legislature between 1836 and 1853. Significantly, railroad charters granted by the Legislature as late as 1870 and 1871, immediately prior to the enactment of the general railroad corporation act, contained similar restrictions on the acquisition and use of real property.
Therefore, ch. 119, Laws of 1872, continued the legislative precedent of placing restrictions on the acquisition and use of lands by railroads. In view of the restrictions in the special charter laws, the Court's construction pertaining to charter provisions in Kelly, and the similarity of the restrictions found in ch. 119, Laws of 1872, the only reasonable conclusion is that ch. 119, Laws of 1872, was intended to restrict the railroads in the acquisition and use of lands. *Page 207 
This intent is manifested today in the language of subsecs. (3) and (4) of sec. 190.02, Stats.
Chapter 180, Stats.
Section 190.02, Stats., provides in part: "Every public railroad corporation shall have the powers conferred on corporations in ch. 180."
Section 180.04 and (4), Stats., provides:
 Each corporation, when no inconsistent provision is made by law or by its articles of incorporation, shall have power:
. . . .
 (4) To purchase, take, receive, lease, take by gift, devise or bequest, or otherwise acquire, and to own, hold, improve, use and otherwise deal in and with real or personal property, or any interest therein, wherever situated.
From the above-quoted language, it is apparent that corporations have unrestricted authority when no inconsistent provision is made by law or by its articles of incorporation to acquire and use real estate. Thus, this unrestricted authority does not exist in the case of railroad corporations if the provisions of sec. 190.02(3) and (4), Stats., are deemed to be inconsistent with sec. 180.04(4), Stats.
The argument could be advanced that the provisions are not inconsistent, for they are both grants of power and sec. 180.04 (4), Stats., merely enlarges on the authority of sec. 190.02(3) and (4), Stats. This argument, however, ignores the legislative intent to restrict land acquisition by railroads which underlies sec. 190.02(3) and (4), Stats.
The theory also ignores the intent behind the grant of general corporate powers to railroads in ch. 119, sec. 11, Laws of 1872. Section 11, predecessor of sec. 190.02, Stats., provided: "Every corporation formed under this act shall, in addition to the powers conferred on corporations in chapter seventy-eight of the revised statutes, have power." The Revised Statutes of 1858 did not give corporations unlimited authority to acquire and use real property, but specifically provided that: "Every such corporation may hold land to an amount authorized by law." Ch. 78, sec. 7, Revised Stats., 1858. *Page 208 
The present language in sec. 180.04, Stats., which states, "when no inconsistent provision is made by law" is synonymous to the language "to an amount authorized by law," found in ch. 78, sec. 7, Revised Stats., 1858. Therefore, sec. 190.02, Stats., is inconsistent with sec. 180.04(4), Stats. The reference to the general corporate law did not eliminate the restrictions of the railroad statute, for ch. 78 of the Revised Statutes of 1858 referred to ch. 119, sec. 11, Laws of 1872.
Charter Powers
Section 190.04, Stats., provides: "All railroad corporations shall have all peculiar rights and privileges granted to them respectively by their charters or any special law, not inconsistent with these statutes."
At first blush, it seems unnecessary to consider powers granted by a railroad charter, for if the charter authorized the railroad to acquire and use lands beyond those authorized in ch. 190, sec.190.04, Stats., would be a repeal of such charter authority. However, sec. 190.04, Stats., first appeared in ch. 119, sec. 55, Laws of 1872, and provided that all existing railroads were to be "subject to all the duties and liabilities" of the act. This language is not as clear as the modern language, "not inconsistent with these statutes," which first appeared in sec. 1829, Revised Statutes of 1878. Repeal by implication is not favored. State v. Dairyland Power Cooperative, 52 Wis.2d 45,187 N.W.2d 878 (1971). Accordingly, before the Revised Statutes of 1878, railroad land acquisition was controlled by individual special charters, rather than by ch. 119, Laws of 1872. Any land or interest in land acquired outside these specific charter provisions was not legally acquired.
In Waldo v. Chicago, St. Paul and Fond du Lac R. R. Co.,14 Wis. 625 (1861), the railroad was attempting to take land as payment for a stock subscription. The land was not adjacent to the line and did not have wood, timber or stone that might be useful to the railroad. In holding that a railroad was not entitled to acquire such property under its charter, the court said:
 But when a corporation created for the purpose of building and operating a railroad, goes into the business of banking, or manufacturing and selling goods, or dealing and speculating in real estate, because its corporators or board of directors think such *Page 209 
adventures may be profitable, . . . the corporation is attempting to transact business which, under its organic act, it has no right or power to do.
14 Wis. at 632.
This case illustrates the policy of holding a corporation to its charter and to what is proper and necessary to implement the purpose of the charter. But more importantly, it shows a clear enforcement of charter restrictions on a railroad seeking to acquire property "not for railroad purposes."
It is my opinion that the provisions of sec. 190.02, Stats., pertain to foreign railroad corporations as well as to domestic railroad corporations organized under ch. 190, Stats. This conclusion is based on the introductory language of sec. 190.02, Stats., which provides that "every public railroad corporation" shall be subject to the terms of the statute. The phrase "every public railroad corporation" surely includes foreign corporations. This intent is evidenced by the fact that in other statutory provisions found in ch. 190, Stats., the Legislature differentiates between domestic and foreign railroad corporations. (See, for example, secs. 190.03, 190.05, and190.06, Stats.)
Further, the initial general railroad incorporation act contained the introductory language, "every corporation formed under this act." Thus, it is clear that the Legislature, in changing the language, intended to control the land practices ofall railroads conducting business in this state. However, this language change did not occur until 1930, see ch. 504, sec. 13, Laws of 1929. Therefore, prior to January 1, 1930, the land activities of foreign railroad corporations were not governed by the provisions of sec. 190.02, Stats., but were controlled by the law of the states in which they were organized.
Based on this discussion, my conclusions are:
 1. Section 190.02(3) and (4), Stats., limit the purposes for which railroads (domestic or foreign) may acquire lands in the State of Wisconsin.
 2. Section 180.04(4), Stats., does not enlarge upon the authority granted in sec. 190.02(3) and (4), Stats., nor does such section remove the restrictions of sec. 190.02(3) and (4), Stats. *Page 210 
 3. Section 190.04, Stats., repealed any special laws that authorized railroad corporations to acquire lands for purposes other than as prescribed in sec. 190.02(3) and (4), Stats. But, any lands acquired by railroads prior to the effective date of the Revised Statutes of 1878 pursuant to charter authority, were legally acquired.
 4. The land acquisition practices of foreign railroad corporations were not controlled by state law prior to January 1, 1930. Since 1930, foreign railroad corporations may only acquire lands in the State of Wisconsin for those purposes set forth in ch. 190, Stats.
 5. Ownership of mineral rights is distinct from acquisition of mineral rights.
 6. From 1878 to the present, domestic railroad corporations did not and still do not have authority to acquire lands or interests in lands for purposes of mineral exploitation or speculation.
 7. It is doubtful that any railroad charter, which would have been controlling prior to 1878, authorized the acquisition of lands or interests in lands for their mineral content.
 8. The answer to whether foreign corporations could acquire lands or interests in lands for their mineral or potential mineral content prior to 1930 depends on the laws of the state under which they were organized.
 9. Since 1930, foreign railroad corporations may not acquire lands or interests in lands for mineral exploitation or speculation.
 10. Lands lawfully acquired by railroads in fee include lawful ownership of the mineral rights in such lands, unless they were expressly reserved.
The second question is:
 (2) Were railroad corporations authorized to retain mineral rights to property granted to the corporations under chapter 137 of the laws of 1856 and similar acts, considering the circumstances surrounding the grants which are explained in a report issued under chapter 69 of the laws of 1858 and considering section *Page 211 
192.71, 1927 statutes, section 190.02(2) and other relevant sections of the statutes and cases?
The answer to this question is no.
Land Grants In Aid of Railroad Construction.
This question refers to the three million plus acres granted by the federal government through the state, acting as trustee, to railroads. Schulenberg v. Harriman, 88 U.S. 44 (1874).
Grants in aid of railroads are to be construed so as to accomplish the intent of Congress. Intent may be determined by reference to the condition of the country at the time the acts were passed. Winona St. Peter R. R. Co. v. Barney, 113 U.S. 618
(1885); United States v. Denver Railway, 150 U.S. 1 (1893).
Prior to the first federal grant, the Wisconsin Legislature adopted Memorial No. 31, Laws of Wisconsin 1854, which was addressed to the Congress of the United States. The significance of this act is that it linked the state request for federal land grants to aid in financing of the construction of railroads to Congress' intent. That intent as evidenced in the Memorial, was to open the land to the settlers:
 The Legislature of the State of Wisconsin respectfully represents;
 That they have observed with interest the progress and final passage through the House of Representatives, of the bill known throughout the nation as the "Homestead bill," and will hail its adoption as the the [sic] true national policy for the disposition of the public lands, believing it to be the duty of every government, so to legislate, as to secure alike to every citizen so far as practicable, a homestead for himself and family, thereby equalizing wealth, and giving labor its just reward.
 . . . [T]hat sufficient of the public lands may be donated to this State to aid in the construction of railways [sic] therein, so that the whole State may be thereby benefitted, and the public domain speedily settled. Provided always; That such donation shall be under the control of the state, with full power to direct the price, and manner of selling the lands so donated.
 . . . . *Page 212 
 . . . That any lands granted shall be constantly open to entry by actual settlers, at a rate not exceeding one dollar and twenty-five cents per acre, and in quantities not exceeding one hundred and sixty acres to any single individual.
Subsequent legislative activity confirmed this intent.
The Grants of 1856 And 1864
Following the state's petition in 1854, Congress made two grants of lands to aid in the construction of railroads. Both grants, 11 Stats. 20 (1856) and 13 Stats. 66 (1864), left to the state the responsibility of distributing the lands to private railroad companies. Few lands were released under the grant of 1856 because the Panic of 1857 ensued and little railroad construction occurred.
The 1864 grant was actually a renewal of the 1856 grant. Both grants contained restrictions consonant with Congress' intent to provide the railroads' land for constructing necessary lines and selling the remainder to settlers. The restrictions in the 1864 grant in essence provided as follows:
 1. That the lands or proceeds of lands were to be exclusively applied to the construction of the road for which granted.
 2. That a quantity of land not exceeding one hundred and twenty sections could be sold on the completion of each twenty miles of road.
 3. That if the roads were not completed in ten years, no further sales would be allowed and lands unsold were to revert to the United States.
Further, in sec. 8, the granting legislation provided: "That the said lands hereby granted shall, when patented as provided in section seven of this act, be subject to the disposal of the companies respectively entitled thereto, for the purposes aforesaid, and no other." 13 Stats. 68 (1864).
Examples of Wisconsin enabling legislation creating railroad charters can be found in chs. 122, 137 and 413, Laws of 1856, and in ch. 314, Laws of 1866. Although the language of the charters differ, they reflect the intent of Congress and the policy expressed by the state in Memorial No. 31, that the lands, except for such small *Page 213 
amounts as needed for actual construction, were to be expeditiously sold to the public with the proceeds being used to finance construction of the railroad lines.
As far as could be ascertained, railroad companies holding grant lands in Wisconsin can trace their grants to this 1864 grant or one of its extensions or amendments. None of the amendments ever mentions a change in the restrictions imposed by Congress.
The similarity in the charter provisions, as well as the identical provisions in the grants of 1856 and 1864, conclusively show, in my opinion, that there was no change in legislative intent. The primary intent of the federal and state legislation was to open and settle the land. Railroads were merely the instrumentality to accomplish this legislative policy.
Act of 1890
In 1890, Congress passed an Act that resumed title to grant lands from those railroads that had failed to build, complete, or operate a railroad in compliance with the grant provisions.26 Stats. 496 (1890). The Act provided, in part:
 That there is hereby forfeited to the United States, and the United States hereby resumes the title thereto, all lands heretofore granted to any state or to any corporation to aid in the construction of a railroad opposite to and coterminous with the portion of any such railroad not now completed, and in operation, for the construction or benefit of which such lands were granted; and all such lands are declared to be a part of the public domain.
The Act had provisions to preserve the rights of purchasers and actual settlers in possession. 26 Stats. 496, secs. 2 and 3 (1890). Its intent, apparently, was to remedy gross violations by railroad corporations of their land grants while still showing the preference for getting the land settled.
 The Federal Land Grant Legislation Did Not Authorize Reservation of Mineral Rights Either Expressly or By Implication
In my opinion, there is no language in the grants of 1856 and 1864 that either expressly or impliedly authorizes the reservation of mineral *Page 214 
rights. The reservation of mineral rights can only be characterized as speculation. The withholding of these interests in lands for future sale would certainly have the potential of frustrating the intent of Congress that the proceeds from the sale of grant lands were to be used for the construction of the railroad and no other purpose whatsoever. None of the Wisconsin railroad charters I investigated authorized the reservation of any interest in grant lands that was not directly related to the operation of the line. In discussing the authority granted under a railroad charter, the court in the early case of Blunt v.Walker and others, 11 Wis. 349, 362 (1860), noted: "The legislature meant only to confine the company to the true objects of its charter, and to forbid its diverting its capital and investing it in real property, and engaging in land speculations."
In any event, if a state charter authorized land speculation, such authority would have been incompatible with the federal grants and void on such ground. Lake Superior Co v. Cunningham,155 U.S. 354 (1894).
Further, there is nothing in ch. 190, Stats., that would authorize the reservation of mineral rights, but to the contrary, sec. 190.02(2), Stats., requires compliance with the term of the grants.
The grants of 1856, 1864 and the Act of 1890 are in parimateria and must be interpreted together. Such acts are to be strictly construed in favor of the government. Rice v. RailroadCompany, 66 U.S. 358 (1861). Therefore, the term "land" or "lands" as used in these acts, would be construed to include all rights and interests therein. Kneeland-McLurg L. Co. v. Lillie,156 Wis. 428, 145 N.W. 1093 (1914); sec. 990.01(18), Stats. Under this construction, reserved mineral rights as "lands" would have been returned to the United States by the Forfeiture Act of 1890. This conclusion is not only logical under the law, but is the most equitable result considering the respective positions or interests of the settlers, the railroads and the public.
In summary, railroad corporations in Wisconsin receiving grants of land from the public domain to aid in the construction of railroads had no authority in federal or state legislation to reserve the mineral rights where the lands were conveyed. If the railroads failed to build, complete and operate a line, their interest reverted to the federal government under the Act of 1890. If they did build, complete and operate *Page 215 
their lines, and were therefore not affected by the Act of 1890, the corporation was still prevented from legally retaining mineral rights by the terms of the grant acts and the state enabling legislation.
The third question is:
 (3) What restrictions apply to the transfer of mineral rights by a railroad corporation under section 192.71, 1927 statutes, and other relevant statutes and cases?
Section 192.71, Stats., had its inception in ch. 160, Laws of 1872. It subsequently appeared as sec. 1858 in the Revised Statutes of 1878. The statute has not changed substantially since 1872, and it provides that a railroad corporation could transfer, sell or assign grant lands to another railroad. Any such transferred lands were to remain subject to the initial conditions imposed on the use of such lands.
I am of the opinion that sec. 192.71, Stats., is not significant to this discussion. That is, even in the absence of sec. 192.71, Stats., transferred or sold grant lands or interest in grant lands would have nevertheless remained subject to the original conditions of the grant. Accordingly, neither the presence nor the absence of the section has any bearing on the legitimacy or invalidity of the reservation, transfer or sale of mineral rights. Nor does it affect the legal position of the railroads, the public, or the property owners to such rights.
Section 1358, Revised Statutes of 1878, was amended by ch. 266, Laws of 1882. This amendment added the present provision in sec. 192.71, Stats., which authorizes this office to commence an action in the supreme court to forfeit the grant lands of those railroads that failed to comply with the terms of the grant.
This provision is best discussed under the fourth question, which is:
 (4) What rights do the owners of the surface rights and the state have to the mineral rights currently or formally owned by railroad corporations considering section 192.71, 1927 statutes, and other relevant sections of the statutes and cases?
This question is extremely difficult to answer for it requires the application of unsettled law to unknown fact situations, and for that reason, no definite conclusion can be reached. I feel it inappropriate *Page 216 
to comment directly on the legal status of private parties and will confine my remarks to the legal interest of the state.
Interest of The State
lt should be clear from the discussion of question two that the state never acquired title to the grant lands except as trustee for the federal government. Notwithstanding the provisions of sec. 192.71, Stats., the state Legislature cannot enlarge upon the land grant of Congress, nor was it the intent of the state Legislature to do so. The forfeiture provision of sec. 192.71, Stats., which was intended to return the lands to the state, was adopted in ch. 266, Laws of 1882, or approximately eight years before Congress adopted the Forfeiture Act of 1890. Accordingly, the state act returned the lands to the state as trustee for the United States.
The state's rights and responsibilities as trustee were limited. lf a railroad corporation had complied with the terms of the grant to the extent of constructing and operating the railroad line, the lands or retained mineral rights would not have been forfeited under the terms of the Act of 1890. The retention and possible subsequent sale of mineral rights, however, would be in violation of the railroad charter, ch. 190, Stats., and the grant itself.
The state, as trustee, may have standing to bring an action based on breach of the grant conditions, but it is difficult to see what beneficial interest the state could acquire as the result of such an action.
The state's duty as trustee under the terms of the grants seems to have been limited to the conveyance of the grant lands to the railroads upon proof of satisfactory compliance with the terms of the grant. The state did not appear to have any responsibility to insure, for example, that the railroads sell the lands and use the proceeds as contemplated in the grant. The state may also have standing to claim violation of state law, i.e., engaging in unauthorized activity, but successful prosecution would not give rise to a claim for the mineral rights or proceeds derived from the sale of such rights.
BCL:CAB *Page 217